707 F.2d 1109
 Sandra TURNER, Debra Scruggs, Jerrylean Baker, on behalf of
themselves and all others similarly situated,
Plaintiffs-Appellees,
v.
Jerold PROD, individually and in his official capacity as
the Executive Director of the Department of Social
Services of the State of California; et
al., Defendants-Appellants.
DEPARTMENT OF SOCIAL SERVICES OF the STATE OF CALIFORNIA,
Defendant and Third- Party Plaintiff/Appellant,
v.
Margaret HECKLER, Secretary of Health and Human Services,
Third-Party Defendant/Appellant.
 Nos. 82-4552, 82-4566, 82-4567 and 82-4599.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted April 11, 1983.
Decided June 10, 1983.
As Amended Aug. 11, 1983.
 
 Gwenda Jones Kelley, Dept. of Health & Human Services, Baltimore, Md., for third party defendants-appellants.
 John J. Klee, Jr., Deputy Atty. Gen., San Francisco, Cal., for defendants-appellants.
 Mark N. Aaronson, Committee for Urban Affairs, John E. Peer, Guy D. Calladine, Long & Levit, San Francisco, Cal., Marilyn Kaplan, Center on Law & Poverty, Los Angeles, Cal., for plaintiffs-appellees.
 Appeal from the United States District Court for the Northern District of California.
 Before ELY, SKOPIL and FERGUSON, Circuit Judges.
 FERGUSON, Circuit Judge:
 
 
 1
 In a case of first impression,[1] the State of California and the federal Department of Health and Human Services (HHS) appeal a grant of partial summary judgment against them and in favor of a state-wide class of workers receiving Aid to Families with Dependent Children (AFDC). The plaintiff class contends that the income used to calculate a welfare family's needs has never, and does not now, include the funds mandatorily deducted from a worker's paycheck for such items as income taxes because that money is never available to such families for the support of their children. The defendant governments reply that, while prior to 1981 the position of the plaintiffs may have been correct, the congressional AFDC amendments enacted in that year mandated this change in departmental procedures. After careful consideration of legislative history, administrative interpretation and congressional purpose, the district court ruled for the plaintiffs in a decision which has the effect of raising AFDC benefits paid in California an average of $83 a month for each of 45,000 recipient families. Looking primarily to congressional purpose, we affirm, 559 F.Supp. 603.
 
 FACTS:
 
 2
 Plaintiffs are the class of all past, present and future Aid to Families with Dependent Children recipients in California who have been or will be affected by a substantive change recently implemented in the AFDC program, purportedly as a result of the enactment of the Omnibus Budget Reconciliation Act of 1981. Pub.L. No. 97-35, Sec. 2302, 95 Stat. 357, 844-45 (1981), 42 U.S.C. Sec. 602(a) (OBRA). The defendants are those California agencies and officials responsible for administering the California AFDC program. The state, in turn, has brought in the Secretary of Health and Human Services as a third-party defendant.
 
 
 3
 AFDC is a federal-state public assistance program authorized by the Social Security Act. 42 U.S.C. Secs. 601-76. States which participate provide assistance to those needy families that include a dependent child as that term is defined within the Act. 42 U.S.C. Secs. 606-07. A percentage of the funds expended by a state is reimbursed by the federal government. Id. at Sec. 603. In return for the federal funds, the states are required to administer their programs pursuant to a state plan which is in accordance with federal statutory provisions and HHS regulations governing AFDC. Id. at Sec. 602.
 
 
 4
 An AFDC family's monthly grant is intended to be limited to the amount which the family needs. The statutes and the regulations attempt to accomplish this purpose by requiring that the state first set a dollar figure, known as the "standard of need," which reflects its view of the amount necessary to provide for essentials such as food, shelter, and clothing for hypothetical families of varying sizes.[2] RAM v. Blum, 533 F.Supp. 933, 937 (S.D.N.Y.1982) (hereinafter RAM I). Next, the state determines the "level of benefits" it will pay, which need not be the full "standard of need" amount.[3] Rosado v. Wyman, 397 U.S. 397, 408-09, (1970). The state then assesses an applicant-family's income and resources and compares the sum of money found to be available to it with the appropriate predetermined benefit level. If the family falls below that level, its AFDC grant will be the amount necessary to close the gap.
 
 
 5
 Congress originally brought AFDC into being as part of the first Social Security Act in 1935. Title IV, Part A, 49 Stat. 62; 42 U.S.C. Secs. 601-76. The statute describes itself as having three purposes: (1) to provide adequate income for needy families with dependent children, (2) to keep such families together, and (3) to encourage adult members of such families to get and keep jobs. 42 U.S.C. Sec. 601; Shea v. Vialpando, 416 U.S. 251, 253 & 264, 94 S.Ct. 1746, 1750, 40 L.Ed.2d 120 (1974). In 1981, when Congress extensively amended AFDC as part of OBRA, 95 Stat. 843-60, this language was left unchanged. The purpose of OBRA was to bring the rapid growth of federal spending under control. "Views of the Committee on the Budget," Senate Report No. 97-139 (June 17, 1981), reprinted in 1981 U.S.Code Cong. & Ad.News 397.
 
 
 6
 Plaintiffs challenge new regulations promulgated by the state Department of Social Services at the direction of HHS following the passage of OBRA. EAS Secs. 44-113.21; 44-113.212-13.[4] The regulations change the method by which AFDC benefits are calculated; the state now considers mandatory payroll deductions such as income tax withholding to be "work expenses" incurred by AFDC recipients in obtaining income and subjects them to a maximum monthly $75 cut-off amount rather than allowing them to be deducted in their entirety prior to calculation of grant monies due as was the practice in the past. The practical effect of these regulations is to reduce aid payments to approximately 45,000 AFDC families within the state by the amount of the respective mandatory payroll deductions withheld from the wages of working recipients. In California the average amount of such a deduction is $83 a month.
 
 
 7
 The Social Security Act, as amended, now requires states to perform a three-step calculation in order to determine AFDC benefits. (1) Determine income amount. (2) Subtract $75 for work expenses from that amount.[5] (3) Subtract the adjusted income amount derived from steps 1 and 2 from the dollar figure set in the state's calculation of level of benefits to determine the exact grant payment which will be made to the recipient. RAM I, 533 F.Supp. at 942; Dickenson v. Petit, 536 F.Supp. 1100, 1105-06 (D.Me.1982).
 
 
 8
 Within this calculation framework, the parties disagree about the meaning of two key terms: "income" and "work expenses." After the 1981 OBRA amendments which, inter alia, instituted the standardized $75 work expenses disregard, 42 U.S.C. Sec. 602(a)(8)(A)(ii), HHS instructed the state agencies that "income" was to be construed as "gross income" and that mandatory payroll deductions for such items as income tax, FICA and disability payments were properly characterized as "work expenses" to be grouped with such expenses as transportation and uniform costs. This entire group of expenses would then be subject only to the standard $75 disregard, regardless of the actual amounts expended or withheld. The State of California has embodied those HHS instructions in the regulations which are at issue in this case. Plaintiffs contend that "income" means net income and thus mandatory payroll deductions are non-income items. Plaintiffs argue that the Social Security Act requires the agencies to deduct both the mandatory tax deductions (at Step 1, determination of income) and the $75 disregard amount (at Step 2, subtract work expenses) in determining the sum necessary to bring the recipient family up to the state's level of benefits.
 
 
 9
 In 1982, a mother with three children who earned the minimum wage ($3.35 an hour) 40 hours a week, 4.3 weeks a month, would have had $59.52 withheld in California for federal and state income taxes, FICA and state disability insurance. If that amount is offset at Step 1 as plaintiffs urge, her income is determined as follows:
 
 
 10
 $3.35 x 172 hrs./month = $576.20
 
 
 11
 - 59.52
 
 
 
 Income Actually Available $516.68
 At Step 2, she would still have $75 available to cover her work-related expenses for transportation, uniforms, union dues, etc., which would in turn reduce her income actually available for offset against her AFDC grant monies to $442, in whole dollars. Assuming a state benefit level of $601, $442 would be subtracted from that amount, giving her a monthly AFDC grant of $159.
 However, if the calculation is made as the governments here urge, her income at Step 1 is $576, and at Step 2 eighty percent of her work-related expenses allowance of $75 is eliminated by withholding. The working recipient will be left with an offset amount of $501 and only $15 to cover the expenses arising from her job. When the $501 is subtracted from the $601 benefit level, she receives $100 in grant monies.
 The district court granted partial summary judgment for the plaintiffs, and entered a permanent injunction in their favor, ruling that mandatory payroll deductions were non-income items eliminated at Step 1 of the calculation process and therefore could not logically also be work-related expenses. Turner v. Woods, 559 F.Supp. 603, 610 (N.D.Cal.1982). The court grounded its decision in the longstanding administrative policy of offsetting against grants only money actually available to AFDC families, and in the purposes of the AFDC Act. It ordered the state agency to cease including these deductions within "income," and enjoined HHS from cutting off matching funds to California as a consequence of the state's compliance with the court's order. From this decision, the federal and state defendants appeal.
 THE STATUTE:
 The statute here at issue has been in the Social Security Act for over forty years. As originally passed in 1939, Sec. 402(a)(7) read as follows:
 A state plan for aid and services to needy families must ...
 (7) provide that the State agency shall, in determining need, take into consideration any other income and resources of any child claiming aid to dependent children;
 Social Security Amendments Act of 1939, Pub.L. No. 76-379, Sec. 401(b), 53 Stat. 1360, 1379-80 (1939) (codified at 42 U.S.C. Sec. 602(a)(7)(A)). In 1962, that section was amended as follows:
 (7) provide that the State agency shall, in determining need, take into consideration any other income and resources of any child or relative claiming aid to families with dependent children, as well as any expenses reasonably attributable to the earning of any such income; ....
 In 1968, 42 U.S.C. Sec. 602(a)(7) was further amended to link it with a revised 42 U.S.C. Sec. 602(a)(8) which detailed disregards of earned income:
 (7) except as may be otherwise provided in clause (8), provide that the State agency shall, in determining need, take into consideration any other income and resources of any child or relative claiming aid to families with dependent children, ... as well as any expenses reasonably attributable to the earning of any such income; (8) provide that, in making the determination under clause (7), the State agency--
 (A) shall with respect to any month disregard--
 (i) ...; (ii) in the case of earned income of a dependent child ... [or] a relative receiving such aid ... the first $30 of the total of such earned income for such month plus one-third of the remainder of such income for such month....
 In 1981, OBRA amended Secs. 602(a)(7) and 602(a)(8) to provide as follows:
 (7) except as may be otherwise provided in paragraph (8) ... provide that the State agency--
 (A) shall, in determining need, take into consideration any other income and resources of any child or relative claiming aid to families with dependent children ....
 * * *
 * * *
 (8) (A) provide that, with respect to any month, in making the determination under paragraph (7), the state agency--
 (i) ...; (ii) shall disregard from the earned income of any child or relative applying for or receiving aid to families with dependent children ... the first $75 of the total of such earned income for such month (or such lesser amount as the Secretary may prescribe in the case of an individual not engaged in full-time employment or not employed throughout the month); (iii) shall disregard from the earned income of any child, [or] relative ... an amount equal to expenditures for care in such month for a dependent child ... receiving aid to families with dependent children and requiring such care for such month, to the extent that such amount (for each such dependent child ...) does not exceed $160 ....
 The plaintiffs here contend that Sec. 602(a)(7) "income" is net income and that therefore mandatory payroll deductions never reach the agency for consideration in determining an AFDC family's need. The defendants contend that Sec. 602(a)(8)(A)(ii) takes precedence over Sec. 602(a)(7), that its "earned income" is gross income, and that the mandatory payroll deductions remain in the amount against which the agency offsets the first $75 of income per month. Our analysis must therefore consider, first, whether there is a difference between "income" under Sec. 602(a)(7) and "earned income" under Sec. 602(a)(8); and second, if there is, which subsection controls the characterization of mandatory payroll withholding under the current statutory scheme.
 ANALYSIS:
 A. Standard of Review
 The district court granted summary judgment on a pure question of law, the interpretation of a statute. There are no disputed facts. Therefore, the standard of review is de novo; the appellate panel applies the same test for summary judgment as did the district court. Radobenko v. Automated Equipment Corp., 520 F.2d 540, 543 (9th Cir.1975).
 In construing a statute in a case of first impression, the courts look to the traditional signposts for statutory interpretation: first, the language of the statute itself; and second, its legislative history and the interpretation given it by its administering agency, both as guides to the intent of Congress in enacting the legislation.
 B. Section 602(a)(7) Income
 
 
 [1]
 The Language
 Although it is axiomatic that the place to begin in interpreting a statute is with the language itself, Consumer Product Safety Commission v. GTE Sylvania, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980), the language is not helpful here. The term "income" as used in Sec. 602(a)(7) is not defined within the statute. As for contemporary, common meaning, Perrin v. United States, 444 U.S. 37, 42, 100 S.Ct. 311, 314, 62 L.Ed.2d 199 (1979), the dictionary definition of income is ambiguous.[6]
 
 
 [2]
 Legislative History and Administrative Interpretation
 Evidence of congressional intent in enacting legislation is often found in legislative history, see Nat'l R.R. Passenger Corp. v. Nat'l Ass'n of R.R. Passengers, 414 U.S. 453, 458, 94 S.Ct. 690, 693, 38 L.Ed.2d 646 (1974), and understanding legislative history is often aided by the history of administrative interpretations of a statute, see Saxbe v. Bustos, 419 U.S. 65, 74, 95 S.Ct. 272, 278, 42 L.Ed.2d 231 (1974).
 Section 602(a)(7) was added to the Social Security Act in 1939 when Congress realized that in initially enacting legislation to help families of needy children, it had neglected to provide that sources of income already available to the household should be taken into consideration and deducted from grants which would otherwise be made. Pub.L. No. 76-379, 53 Stat. 1379 (1939). The language was drafted by the Social Security Board.[7] H.R.Doc. No. 110, 76th Cong., 1st Sess. (1939) (Presidential report to Congress transmitting Social Security Board's "Proposed Changes in the Social Security Act"). In the hearings and floor debate which accompanied the amendment, concern was expressed that the needy not be penalized through inclusion in their income of sums not actually available to them. See, e.g., testimony of Arthur Altmeyer, head official of Social Security Board, Hearings Relative to the Social Security Amendments Act of 1939, 76th Cong. 1st Sess. at 2254; remarks of Rep. Poage, 84 Cong.Rec. 6851, June 8, 1939. Although mandatory payroll deductions did not exist in 1939 in the form in which we know them now, because payroll withholding of income tax did not begin until 1943 and Congress therefore cannot have had these express deductions in mind, as early as 1937 there was modest payroll withholding for the Federal Insurance Compensation Act (FICA), and it seems fair to say that there was genuine congressional concern that resources counted against a family be actually available for its use.
 The agency interpretations and behavior in this time period buttress the idea that Congress meant to offset only net income in determining assistance payments. In December 1940, the Social Security Board adopted a policy statement providing that Sec. 602(a)(7)(A) income must "actually exist" and be "available to the applicant," defining availability as being "actually on hand or ready for use when needed." In 1942, this policy was incorporated into an official manual used by the department for some period of time to instruct the states on federal AFDC requirements. Guide to Public Assistance Administration, p 202, at 1-2 (1942).[8]
 From the middle 1950s to the present, there has been an agency regulation defining the term "income" as it appears in Sec. 602(a)(7)(A) as "net income" RAM I, 533 F.Supp. at 942; see, e.g., Lewis v. Martin, 397 U.S. 552, 555, 90 S.Ct. 1282, 1283, 25 L.Ed.2d 561 (1970).[9] It was republished after OBRA was enacted and now reads:
 A State Plan for ... AFDC ... must ... provide that, in determining need and the amount of the assistance payment, ... net income ... and resources available shall be considered; income and resources are considered available both when actually available and when the applicant or recipient has a legal interest in a liquidated sum and has the legal ability to make such sum available for support and maintenance.
 
 
 [45]
 C.F.R. Sec. 233.20(a)(3)(ii)(D), as amended by 47 Fed.Reg. 5648, 5675 (Feb. 5, 1982) (emphasis added)
 It is clear that the agency charged with the administration of this statute has long regarded it as dealing with net income exclusively. That interpretation has not changed in the wake of OBRA. Such an agency interpretation, while not binding, is entitled to substantial deference by a court. United States v. Rutherford, 442 U.S. 544, 553-54, 99 S.Ct. 2470, 2475-2476, 61 L.Ed.2d 68 (1979); New York State Department of Social Services v. Dublino, 413 U.S. 405, 421, 93 S.Ct. 2507, 2516, 37 L.Ed.2d 688 (1973). That deference is heightened when the interpretation has remained consistent for long periods of time. EEOC v. Associated Dry Goods Corp., 449 U.S. 590, 600 n. 17, 101 S.Ct. 817, 823 n. 17, 66 L.Ed.2d 762 (1981). Here we deal with an uninterrupted, consistent interpretation stretching over forty years. Moreover, the practice of treating income for purposes of determining need as net income has received tacit legislative approval since Congress has never availed itself of the opportunity to amend this language even though it has altered this section at least three times--in 1962, 1967 and 1981. See Saxbe v. Bustos, 419 U.S. at 74, 95 S.Ct. at 278 (congressional silence implies approval of "longstanding administrative construction").
 This legislative and administrative history of the term income was regarded as largely dispositive by the district court, Turner v. Woods, 559 F.Supp. at 610-11, and was similarly weighted by the courts in Williamson v. Gibbs, --- F.Supp. ----, ---- - ----, No. C83-164R (W.D.Wash. Mar. 28, 1983); Nishimoto v. Sunn, --- F.Supp. ----, ---- - ----, No. 82-03591 (D. Hawaii Jan. 6, 1983); and RAM I, 533 F.Supp. at 942, 945. They reasoned that if "net income" was what was established at Step 1 of the AFDC procedure, the mandatory payroll deductions were already absent from the monies available prior to the application of the deductions specified at Step 2, by Sec. 602(a)(8). We continue our analysis, however, because the defendants contend that the key statutory term is not "income" as it appears in Sec. 602(a)(7) but rather "earned income" as it appears in Sec. 602(a)(8)(A)(ii).
 C. Section 602(a)(8) "Earned Income"
 
 
 [1]
 The Language
 Defendants argue and the court in Dickenson v. Petit, 536 F.Supp. at 1111, reasoned that because Sec. 602(a)(7)(A) speaks in terms of "income" without qualification, while Sec. 602(a)(8) speaks in terms of "earned income," Sec. 602(a)(7)(A) must have a broader meaning: that it must include both earned and unearned income. The court continued,
 "Earned income," which includes tax withholdings, is thus a subset of the more general category of "income." A fortiori, "income" in section 02(a)(7) includes tax withholdings.
 Id. The Bell court extended this line of reasoning further, saying:
 The word "income" is used in 42 U.S.C. Sec. 602(a)(7). The words "earned income" are used in 42 U.S.C. Sec. 602(a)(8). Sec. 602(a)(7) has since 1968 contained the direction that where Sec. 602(a)(8) applies, i.e., to earned income, calculations are to be made not under (a)(7) but under (a)(8).
 Bell v. Hettleman, 558 F.Supp. 386, 393 (D.Md.1983) (emphasis added). The "direction" to which the Bell court referred occurs at the beginning of Sec. 602(a)(7) and reads: "except as may be otherwise provided in paragraph (8) ..., provide that the State agency ...."
 Both the Bell and Dickenson courts ignore the historical fact that while the language which they quote has remained essentially unchanged since 1967, prior to the enactment of OBRA in 1981, Sec. 602(a)(8) dealt only with the old work incentive disregards which required additional deductions from household income and did not deal in any way with disregards of work expenses or offsets for mandatory tax withholding. In other words, before 1981 Sec. 602(a)(8) did not act in any way whatever as a substitution for or limitation on Sec. 602(a)(7). See full text of statutes at 1113-1114 supra.
 Indeed, before OBRA was passed it was the intent of Sec. 602(a)(8) to maximize the amount of earned income which AFDC recipients could keep, thereby making it as worthwhile as possible for them to obtain and keep employment. See, e.g. Notice of Final Policies and Requirements, 34 Fed.Reg. 1394 (1969); S.Rep. No. 744, 90th Cong., 1st Sess. (1967), in 1967-2 U.S.Code Cong. & Admin.News, pp. 2834, 2837; RAM v. Blum, --- F.Supp. ---- at n. 32 No. 82 Civ. 372 (RJW) (S.D.N.Y. May 17, 1983) at n. 32 (hereinafter RAM II ). This goal was in part accomplished by statutorily using the term "earned income" and then regulatorily defining that term in as all-inclusive a fashion as possible, so that when the monthly $30 plus one-third disregard was calculated, as small an amount as possible was available for subtraction from the state level of benefits. See example infra at 1122-1123.
 Prior to the enactment of OBRA, Sec. 602(a)(7) had a complementary purpose. The statutory language required deduction of any reasonable expenses attributable to employment, Shea, 416 U.S. at 260, 94 S.Ct. at 1753, and the regulations spoke in terms of deducting from monthly grant monies only those funds actually available for the support of the child. This construction also maximized the amount of their earnings which AFDC recipients could keep.
 In order that the two subsections work together to make the disregards as large as possible, it was necessary that the calculations of subsection 8 be performed prior to the subtractions of subsection 7; in that fashion, the recipient was entitled to offset one-third of the largest possible sum. Therefore, the introductory language which Bell quotes came into the law in 1967. The purpose of that language in 1967 was certainly not to control all calculations applying to earned income, as the Bell court said, since any reasonable expenses attributable to the earning of income were controlled by Sec. 602(a)(7) from 1967 until 1981. We therefore reject Bell's construction of this wording of the statute.[10]
 
 
 [2]
 Legislative History and Administrative Interpretation
 As noted above, when Congress enacted AFDC in 1935, it did not provide for reduction of its grants in aid to needy families when there were other sources of income available to the child. Congress eliminated this problem in 1939 by requiring that grants be referenced to recipients' other income sources. An AFDC recipient's grant was henceforth reduced by the exact amount of that individual's non-AFDC income. This served one AFDC purpose, that of providing for only those children in actual need, but it disserved another purpose, that of encouraging adult recipients to accept or retain paid work outside the home, because there was no allowance for costs of employment such as transportation and uniform expenses. The Act in its 1939 form actually discouraged AFDC recipients from working because it left them with less money when they worked than it did when they did not. S.Rep. No. 1589, 87th Cong., 2d Sess., 17-18 (1962); H.R.Rep. No. 1414, 87th Cong., 2d Sess., 23 (1962); 1962 U.S.Code Cong. & Ad.News 1943, 1959-60. The federal agencies administering the program recognized this disincentive and urged, but did not require, states to allow credit for work-related expenses in determining eligibility. Social Security Board State Letter No. 4, "Facilitating Employment of Assistance Recipients Through Means of Sound Determination of Need" (April 30, 1942), republished in Handbook of Public Assistance Administration at Sec. 3140 (1962); Shea, 415 U.S. at 259, 94 S.Ct. at 1753; RAM II, at ---- & n. 22. However, in the 1939-1962 period neither the states nor the agency regarded mandatory payroll deductions as work expenses. RAM II, at ---- - ---- & nn. 22 & 23. For example, in 1959 HEW reported that the states used the term "gross income" to refer to "take-home pay" after payroll deductions and the term "net income" to refer to amounts available after "other employment costs have been recognized." HEW Report, "State Methods for Determining Need in the Aid to Dependent Children Program," Public Assistance Report No. 43 (May 1961) at 25, cited in Bell v. Hettleman, 558 F.Supp. at 391-92.
 In 1962, Congress eliminated the disincentive to work by amending the statute to make the agency's optional practice mandatory for the states. The Act now provided that AFDC recipients must be given full credit for "work expenses." It instructed the state agencies to disregard "[a]ny expenses reasonably attributable to the earning of ... income" in the calculations made for purposes of determining AFDC benefits. 42 U.S.C. Sec. 602(a)(8)(A)(ii)-(iii); Shea, 415 U.S. at 263-65, 94 S.Ct. at 1755.
 In 1967, Congress moved to provide further encouragement for adult members of AFDC families to work. It enacted the so-called "work incentive disregard" by which the first $30 of gross income earned, plus the next one-third of gross income earned in each month, was disregarded in the calculation of AFDC benefits. Pub.L. No. 90-248, 81 Stat. 821, 881 (1968). This created a substantial inducement for such adults to work as it allowed their pay to add greatly to their disposable income. (This is demonstrated in the illustrative calculations provided at 1122-1123 infra.)
 Between 1962 and 1974, some twenty states moved to simplify the administration of the work expenses allowance by providing a flat sum of money to cover estimated average expenses rather than listing them individually for each claimant. However, in 1974, the Supreme Court required that the "work expenses" disregard be itemized for each AFDC family, holding that failure to do so (1) contradicted the plain language of the statute which allowed "any " expenses which were reasonable and (2) contravened a basic purpose of the act in that it discouraged employment in AFDC families. Shea v. Vialpando, 416 U.S. at 260, 94 S.Ct. at 1753. The Court stressed the second reason in holding that a flat sum was permissible for administrative reasons as long as provision was made to compensate those claimants whose work-related expenses exceeded the flat sum amount so that no claimant would suffer any loss of income by working. Id. at 265, 94 S.Ct. at 1755.[11]
 In the post-Shea period, itemization fully reimbursed working AFDC recipients but created a substantial administrative burden. Several long agency documents and reports where mandatory payroll deductions are grouped with and referred to as "work related expenses" date from this post-1974 period. The defendants point to these documents as proof that such deductions are work-related expenses and either (1) always have been so, or (2) became so after 1974 and certainly were so regarded by Congress by the time OBRA was enacted in 1981. S.Rep. No. 97-139, 97th Cong., 1st Sess. 501-02 (1981); 1981 U.S.Code Cong. & Ad.News 396, 768-79.
 By 1981, Congress had apparently had enough of the administrative difficulties and expenses and the problems of applicant falsification created by individual itemization of work expenses. "Senate Finance Committee Recommendations, Social Security Provisions," reprinted in 1981 U.S.Code Cong. & Ad.News 396, 768. It enacted OBRA, which overruled Shea by standardizing the "work expenses" disregard; instead of individual itemization, each working AFDC recipient now receives a standardized credit of $75 per month against income, regardless of the amount of the individual's actual work expenses. There is nothing in the legislative history of this amendment which definitively speaks to the issue of whether Congress intended to include mandatory payroll withholding in this change. Nonetheless, at least two witnesses did categorize mandatory payroll deductions as work-related expenses in their testimony at legislative committee hearings.[12] However, testimony of witnesses before congressional committees prior to passage of legislation generally constitutes only "weak evidence" of legislative intent. 2A C.D. Sands, Statutes and Statutory Construction, A Revision of the Third Edition of Sutherland on Statutory Construction Sec. 48.10 (4th ed. 1973).
 Since 1969 there has been an agency regulation defining Sec. 602(a)(8) "earned income" as gross income. Its current, post-OBRA form reads:
 the total amount, irrespective of personal expenses, such as income-tax deductions, lunches, and transportation to and from work, and irrespective of expenses of employment which are not personal, such as the cost of tools, materials, special uniforms, or transportation to call on customers.
 
 
 [45]
 C.F.R. Sec. 233.20(a)(6)(iv), as amended in 47 Fed.Reg. 5648, 5676 (1982) (emphasis supplied)
 Arguing judicial deference to an agency interpretation, Quern v. Mandley, 436 U.S. 725, 738, 98 S.Ct. 2068, 2076, 56 L.Ed.2d 658 (1978), the defendant governments contend that this alone should be dispositive. However, as we have indicated:
 [A]n agency's interpretations are not conclusive, and the courts are not bound by them. Social Security Board v. Nierotko, 327 U.S. 358, 369 [66 S.Ct. 637, 643, 90 L.Ed. 718] (1946). In particular, the deference due an administrative interpretation depends upon its consistency with earlier agency pronouncements, Morton v. Ruiz, 415 U.S. 199, 237 [94 S.Ct. 1055, 1075, 39 L.Ed.2d 270] (1974), the purpose and wording of other agency regulations, Pacific Coast Medical Enterprises v. Harris, 633 F.2d 123, 131 (9th Cir.1980), and the purposes of the relevant statutes. United States v. Larionoff, 431 U.S. 864, 873 [97 S.Ct. 2150, 2156, 53 L.Ed.2d 48] (1977).
 McCoog v. Hegstrom, 690 F.2d 1280, 1284 (9th Cir.1982). As mentioned, the term gross income has been differently defined at different times in the history of agency administration of AFDC. Bell v. Hettleman, 558 F.Supp. at 391-92. Thus, the simple definition of the term is inconsistent with earlier pronouncements. More important, the regulation, as the agency proposes to administer it, is in flat contradiction with the regulatory interpretation of 42 U.S.C. Sec. 602(a)(7) embodied in 45 C.F.R. Sec. 233.20(a)(3)(ii)(D), which has been agency policy for forty years, as discussed supra in Section B. Finally, the proposed application of this regulation undermines the purposes of both OBRA and the AFDC Act, as we discuss in Section D infra. For these reasons, deference is not appropriate in this context.
 In our view, if mandatory payroll deductions enter into income at all, they must be treated as work-related expenses subject to the $75 ceiling enacted by OBRA, because no separate disregard for payroll withholdings exists. It is this argument which the Dickenson, O'Bannon, and Bell courts found persuasive. Bell v. Hettleman, 558 F.Supp. at 391-92; James v. O'Bannon, 557 F.Supp. at 639; Dickenson v. Petit, 536 F.Supp. at 1110-15. We, however, reject the original premise of the argument that such withholding enters into income.
 The 1981 Congress certainly had the power to change the intent of the legislation enacted by the 1939 and 1962 Congresses, that payroll withholding not be counted as available to the claimant. But did the 97th Congress do so? This long history seems inconclusive. Allowances for mandatory payroll deductions were widely made before 1962, RAM II, at ---- - ---- & n. 22, either on the strength of the agency's interpretation of the Sec. 602(a)(7) "income available to the applicant" standard or, perhaps, on the basis of the statutory purpose alone. 42 U.S.C. Sec. 601. In the legislative history of the 1962 amendment, which first brought "work related expenses" into AFDC law, there is no reference to mandatorily withheld taxes as work-related expenses. RAM I, 533 F.Supp. at 946. The RAM I court observed that such reference was unnecessary with regard to this amendment since the deductions were already being made under the "net income" provisions of Sec. 602(a)(7)(A). Id. Moreover, after the amendment passed, HEW prepared the Handbook of Public Assistance Administration for distribution to the states to aid them in calculating allowable work-related expenses; mandatory payroll deductions do not appear on the lists provided although they were routinely deducted from income at that time. RAM II, at ---- - ----; Bell v. Hettleman, 558 F.Supp. at 391.
 Between 1962, when the work expenses disregard was mandated, and 1974, when Shea was decided, the two groups of items were treated differently in the states which allocated flat sums to cover expenses; in these states mandatory payroll deductions continued to be individually itemized in this period. See, e.g., the Colorado plan described in Shea, 416 U.S. at 255, 94 S.Ct. at 1751; RAM II, at ---- - ---- & n. 26. The district court in the instant case believed that this practice evidenced their conceptually different origin in the law as "non-income items." It reasoned that only in the post-Shea period did it become "administratively convenient" to group the two together since both were deducted from gross income and their order and grouping made no difference in the calculation of AFDC benefits as performed at that time. Turner v. Woods, 559 F.Supp. at 612.
 In summary, surviving agency records seem to indicate that, prior to 1962, such deductions were seen as funds not available to the recipient and thus were categorized as non-income items. The total absence of reference to mandatorily withheld taxes in the legislative history of the 1962 agency-initiated congressional amendment and in the subsequent agency publications, and the 1962-74 bookkeeping practices of the only states which would have had any reason to differentiate between the two types of items, indicate that prior to the Shea decision, the two items continued to be seen as conceptually different. It is only in the post-Shea era, when that difference becomes irrelevant because both sums are being deducted in full from total earned income, that the agency and the states apparently began to refer to mandatorily withheld payroll deductions as work-related expenses. It goes without saying that a change in the way in which an agency administers a statute does not change the intent with which Congress enacted it. The defendants appear to argue here that the agency practice became so notorious between 1972 and 1981, and the documents presented to Congress in 1981 were so clear in their references to such taxes as work-related expenses, that the 97th Congress intentionally chose to repeal sub silentio the "income available" standard of the 76th Congress. The change in agency practice seems established. Whether Congress had adequate notice of that change is unclear. What is clear is that Congress had no notice of the fact that the change would create a conflict with longstanding and familiar interpretations of Sec. 602(a)(7). We therefore refuse to hold that Congress has repealed a forty-year-old policy by implication. We are aided in reaching this conclusion by our consideration of the underlying purposes of the two statutes which follows.
 D. Congressional Purpose
 As noted earlier, the legislative and administrative histories are usually pursued in an effort to ascertain something more important, the purpose of Congress in enacting a specific piece of legislation. If a court can ascertain that purpose, it is usually dispositive of an issue of statutory construction. Chapman v. Houston Welfare Rights Organization, 441 U.S. 600, 608, 99 S.Ct. 1905, 1911, 60 L.Ed.2d 508 (1979); Philbrook v. Glodgett, 421 U.S. 707, 713-14, 95 S.Ct. 1893, 1898, 44 L.Ed.2d 525 (1975). In this instance, we have two such acts, AFDC and OBRA.
 In the case of AFDC, the statute itself states its purposes. It reads in relevant part:
 For the purpose of authorization of appropriations ... enabling each State to furnish financial assistance ... to needy dependent children and the parents or relatives with whom they are living ... and to help such parents or relatives to attain or retain capability for the maximum self-support and personal independence consistent with the maintenance of continuing parental care and protection ....
 42 U.S.C. Sec. 601. Those purposes have been construed and commented upon at length by the Supreme Court. Shea v. Vialpando, 416 U.S. at 253, 94 S.Ct. at 1750 (see discussion supra at 1119 & n. 10). Shea ultimately teaches two things: In construing AFDC legislation, look to (1) the language and (2) the underlying purposes of the Act. In Shea, the Court struck an agency-approved practice in part because it undermined one of the Act's principal purposes; it discouraged welfare recipients from working by failing to reimburse them fully for their working expenses. Id. at 265, 94 S.Ct. at 1755. The statutory language embodying the purposes of AFDC stands today in the Act as it was at the time of Shea. It was not amended by OBRA in 1981.
 The Omnibus Budget Reconciliation Act was framed in order to restrain federal spending, specifically by reducing its growth, according to the House Budget Committee Report. 1981 U.S.Code Cong. & Ad.News at 398. Without citation of authority, the Third Circuit has recently observed:
 The primary purpose of the OBRA amendments to the AFDC program is to reduce or eliminate welfare benefits for those considered by Congress to be less needy than those completely without resources--persons or households that have available other sources of income or resources with which to support themselves.
 Philadelphia Citizens in Action v. Schweiker, 669 F.2d 877, 879 (3d Cir.1982). There are actually two Congresses and two sets of intentions at issue here; however, the 97th (OBRA) Congress, while making the changes in benefits which we have discussed at length, also left intact the earlier language of the 76th Congress embodying the statutory purposes. Therefore, it seems incumbent upon a court to reach a reading which accommodates both purposes as well as possible. We hold that the district court's reading, with minor clarification, does that.
 Granting arguendo that OBRA's purposes were as stated by the Third Circuit, the congressional AFDC amendments which are not at issue in this case fully accomplish them. The major money-saving change in this aspect of AFDC arises out of the virtual elimination of the work incentive allowance. From 1967 to 1981, a working AFDC recipient was permitted to disregard $30 plus one-third of gross income each month. For someone employed full time at the minimum wage, this amounts to a sum of several hundred dollars monthly. Under OBRA, this disregard may be taken only on net income, and then for only the first four months of eligibility; a recipient may not again utilize this disregard until s/he has been off AFDC for a period of twelve consecutive months. Second, under pre-OBRA law, child care expenses were deductible in full. Now they are subject to a cap of $160 a month per child. Finally, other work-related expenses were deductible in full. Now they are subject to a maximum of $75 per month. None of these changes are disputed here, and as the example below indicates, they represent a substantial reduction of benefits.
 A set of calculations based upon the income of one class member, Catherine Bass, will illustrate these different systems of calculation and demonstrate why the district court ruling best embodies the various goals of the different pieces of legislation here at issue.
 Ms. Bass has five children. She is eligible for a grant of $771 per month if she does not work at all. She works full time and earns $730 per month. She has child care expenses of $235 per month, other actual work-related expenses of $180 per month, and has $84 a month withheld mandatorily from her paycheck.
 Under the pre-OBRA AFDC provisions, the agency would first have deducted the work-incentive allowance, $30 plus one-third of her gross income, subtracting $273 from her income of $730. Then it would have subtracted $84 for mandatory withholding and $415 for her actual work expenses plus child care. That leaves Ms. Bass with a total net income of minus $42; therefore, none of her working income would have been offset against her grant monies, and she would have collected her full grant amount of $771 a month. That would bring $1501 into her household each month; actual work-related expenses and withholding amount to $499, leaving her with $1002 as spendable income. Since she would have received $771 for doing nothing, her financial incentive for a full month of work is $231.
 Under the post-OBRA method of calculation which the governments espouse, Ms. Bass is still eligible for $771 and still earns $730. She does not receive the work-incentive disregard nor are the mandatory deductions subtracted. She is allowed to subtract her child-care expenses of $235 and take the $75 work-expenses disregard, which reduces her income to $420. When the state offsets this against the $771 grant amount, that qualifies her for $351 in AFDC funds, so that a total of $1081 comes into her household each month. However, she has actual work-related expenses of $415 and $84 in payroll withholding, which when subtracted from the $1081 amount, reveal that she is receiving $582 a month for working when she could get $771 from the state simply by staying home. It is costing her $189 monthly to go to work.
 Under the construction of the Act adopted by the district court, Ms. Bass subtracts $84 in payroll deductions from her $730 salary, leaving her with $646. She then subtracts an additional $75 for work-related expenses and $235 in child care, leaving her with the sum of $336 to offset against the maximum grant of $771. The state will pay her $435 a month in grant monies, bringing a total of $1165 into her household. The $499 she actually spends ($415 plus $84) subtracted from that amount leaves her with income of $666, which is $105 less a month than she would receive for staying at home. While she is still penalized for working, the penalty is less; and since the defendants contend that California working expenses are very high,[13] it is possible that nationally this method of calculation does not actually fine the recipient for working.[14] In any event, this method of calculation provides less of a disincentive to work than does that advanced by the government. If the court is to give any meaning at all to the purposive language which remains within the AFDC Act, it would seem that adoption of this method of calculation is required.
 This construction also best implements the purposes of OBRA to "reduce welfare benefits" and restrain the growth of government spending since it is important to remember that the choice is not between making higher or lower benefit payments. The state levels of payments have been set. See, e.g., Cal.Welf. & Inst.Code Sec. 11452. The choice is between working and not working. If the disincentive provided is strong enough, there is no reason to believe that AFDC recipients will work in order to pay handsomely for the privilege. If that eventuality materializes, the result of the statutory construction which the governments urge will be a rise in government spending through increased welfare payments--an end result which would contravene the intent of both the 76th and the 97th Congresses. RAM II, at ----. We therefore hold that mandatory payroll deductions for taxes, i.e., local, state and federal income taxes, Social Security, FICA, state disability programs and equivalent items and programs, are not income for purposes of AFDC calculations performed pursuant to 42 U.S.C. Secs. 602(a)(7) and 602(a)(8).
 The state appellants contend that the district court holding fosters disparity and invites fraud. They stress the possibility of fraud in the number of dependents declared for tax purposes by AFDC recipients and the inequity of allowing an offset for such items as union dues and uniforms when mandatorily withheld when there is no such allowance for a worker who must pay those same sums out of income actually received.[15] In California past AFDC practice has required recipients to report the number of dependents whom they have claimed for tax purposes to the state agency, and that number had to be congruent with the number claimed for AFDC purposes. EAS Sec. 44-133.241(1) (repealed by Manual Letter 81-65, November 10, 1981). That regulation could be reinstated with minimal difficulty should it be needed. Moreover, a recent California Court of Appeals decision makes income tax refunds income for AFDC purposes,[16] a categorization which could serve as a second check on fraud. When one considers as well that each AFDC recipient is required monthly to show his payroll check stub to the county welfare agency, EAS Sec. 40-181.2, we see little possibility of fraud in this area.
 With regard to the non-governmental deductions, we see nothing in the district court opinion which denominates them as non-income items. The district court speaks of mandatory payroll withholding in terms of "federal, state and local income taxes, Social Security taxes (F.I.C.A.), and state disability," Turner, 559 F.Supp. at 616, and the appellees speak of "mandatory tax withholding." We believe the Turner holding to be limited to these and equivalent areas. Most workers who receive payroll checks must pay governmentally withheld amounts for these purposes, and the amounts are easily verified. By limiting the district court's ruling in this fashion, if indeed we limit it at all, we conform to the intent of Congress in enacting OBRA, which was to make the handling of AFDC administratively simpler and less time consuming. Since payroll stubs of all working AFDC recipients may already be reviewed monthly, we agree with the district court in its characterization of mandatory payroll withholdings as "paradigmatic examples of items not subject to applicant falsification and not at all difficult for administering states to calculate." Turner v. Woods, 559 F.Supp. at 613 (emphasis in original).
 In summary, legislative and administrative history demonstrate that "income" for purposes of Sec. 602(a)(7) should be construed as income net of mandatory payroll deductions. To construe Sec. 602(a)(8) as the defendants urge would require us to determine that Congress repealed a long-standing policy by implication; we decline to do so. Both the purposes of AFDC embodied in the statute, and the purposes of OBRA as stated in the legislative history and expanded upon in the case law, are best served by a holding that "income" for AFDC purposes does not include mandatory payroll withholding for items such as local, state, and federal income taxes, FICA, state disability and equivalent governmental programs. The district court is AFFIRMED.
 
 
 [1]
 There are no circuit court opinions currently reported on this issue. There are nine district court decisions, eight of which have been reported. Five of them rule for the plaintiffs and three for the defendants. RAM v. Blum, 564 F.Supp. 634 (S.D.N.Y.1983) (summary judgment and permanent injunction for plaintiff) (cited hereinafter as RAM II ); Williamson v. Gibbs, 562 F.Supp. 687 (W.D.Wash.1983) (preliminary injunction for plaintiff), appeal docketed, No. 83-3725 (9th Cir. Apr. 7, 1983); Bell v. Hettleman, 558 F.Supp. 386 (D.Md.1983) (summary judgment for defendant), appeal docketed sub nom. Bell v. Massinga, No. 83-1227 (4th Cir. Mar. 15, 1983); Nishimoto v. Sunn, 561 F.Supp. 692 (D.Hawaii 1983) (summary judgment for plaintiff), appeal docketed, No. 83-1830 (9th Cir. Apr. 4, 1983); Turner v. Woods, 559 F.Supp. 603, (N.D.Cal.1982) (permanent injunction for plaintiff) (affirmed in this opinion); James v. O'Bannon, 557 F.Supp. 631 (E.D.Pa.1982) (summary judgment for defendant), appeal docketed, No. 82-1438 (3d Cir. July 21, 1982); Dickenson v. Petit, 536 F.Supp. 1100 (D.Me.1982) (summary judgment for defendant), aff'd on other grounds 692 F.2d 177 (1st Cir.1982); RAM v. Blum, 533 F.Supp. 933 (S.D.N.Y.1982) (preliminary injunction for plaintiff) (cited hereinafter as RAM I )
 
 
 [2]
 See, e.g., Cal.Welf. & Inst.Code Sec. 11452 (West 1982)
 
 
 [3]
 See, e.g., Cal. Welf. & Inst. Code Sec. 11450, which sets maximum grant amounts which are identical with those amounts currently set in the standard-of-need statute through family units of ten members
 
 
 [4]
 SDSS--EAS Secs. 44-113.211, 44-113.212 and 44-113.213, as amended November 10, 1981, read in relevant part:
 Sec. 44-113.21 Computation of Net Nonexempt Earned Income for Aid to Families with Dependent Children
 .211 Determine the total amount of commissions, wages or salary earned as an employee during or applicable to the month (i.e., total income irrespective of expenses, voluntary or involuntary deductions)....
 .212 Determine the total profit from self-employment by a recipient whose earnings are not exempted under Section 44-111.22 by offsetting the business expenses against the gross income from self-employment.
 a. Personal expenses such as income tax payments, lunches, entertainment and transportation to and from work are not classified as business expenses and shall not be deducted from gross income in determining total profit earned from self-employment....
 .213 For each recipient, combine any total earnings determined in .211 above with any total profit determined in .212.
 
 
 [5]
 For four months at the beginning of an AFDC period of eligibility, a working recipient will also receive a "work incentive" disregard of $30 a month plus one-third of the remaining net income. After the fourth month the recipient will not be eligible again until that individual has been off AFDC entirely for a period of twelve consecutive months. 42 U.S.C. Sec. 602(a)(8)(A)(iv), (B)(ii)(I). No aspect of this disregard is at issue in this case
 This four-month program is not to be confused with the old work incentive disregard enacted in 1967 and repealed by OBRA in 1981, the significance of which is discussed and illustrated infra at 1122-1123.
 
 
 [6]
 It reads, "the money or other gain received ... by an individual ... for labor or services." Webster's New World Dictionary of the American Language, 711 (2d college ed. 1972)
 
 
 [7]
 There have been three predecessor agencies to HHS--the Social Security Board, the Federal Security Agency, and the Department of Health, Education and Welfare. RAM II, at n. 11
 
 
 [8]
 The 1940 policy was expressed as follows:
 The policies and procedures adopted by the State agency shall be consistent with the following criteria for the consideration of income and resources in the determination of need:
 (a) The income or resource shall actually exist. Attributing a definite amount of income to sources or to kinds of property that produce either no income or less than the amount attributed to them is fictitious and such an imputed amount cannot properly be considered as an actual resource.
 (b) The income or resource shall be available to the applicant. To be regarded as available, an income or resource must be actually on hand or ready for use when it is needed. Consideration does not mean attributing a resource to sources from which income, contributions, maintenance, or support are not in fact available and forthcoming. Nor does it mean including as available for conversion to cash, ownership in real and personal property that is already meeting established requirements of the needy person or family.
 (c) The income or resource shall have some appreciable significance in meeting the requirements of the applicant. The amendments are not intended to require State agencies to bring inconsequential resources under scrutiny in establishing need, such as those resulting from casual earnings, small and unpredictable gifts of indeterminate value, or past income that will not continue in the future.
 (d) The income or resource shall be considered from the standpoint of its conservation and its maximum utilization in the interest of the welfare of the applicant. The effect of the resource on need should be taken into full consideration both in regard to the requirements that it provides on one hand, and the expenses that are associated with the applicant's obtaining, conserving, or utilizing it on the other.
 It was reiterated nearly verbatim in the 1942 Manual. Bureau of Public Assistance, State of Administration, Part II, Plan of Operation, Recommended Criteria of Need (May 22, 1942) at 2.
 
 
 [9]
 The 1967 version of the regulation quoted in Lewis v. Martin, 397 U.S. at 555, 90 S.Ct. at 1283, reads: "[O]nly income and resources that are, in fact, available to an applicant or recipient for current use on a regular basis will be taken into consideration in determining need and the amount of payment." The Supreme Court said the regulation clearly comported with the Act
 
 
 [10]
 A similar historical misunderstanding led the Dickenson court to mistakenly cite a 1971 opinion of this circuit in support of its construction of the term "income." 536 F.Supp. at 1111 n. 7. In Arizona Dep't of Public Welfare v. Dep't of Health, Education & Welfare, 449 F.2d 456 (9th Cir.1971), we required that disregards from earned income under Sec. 602(a)(8)(A) be made from the gross amount and assumed a definition of that term which included mandatory payroll withholding. At that time, that subsection of the statute and 45 C.F.R. Sec. 233.20(a)(6)(iv) applied only to the work incentive disregard provision subsequently repealed by OBRA. Because of this, the case has no bearing on the exclusion of mandatory payroll deductions and out-of-pocket work expenses; they were then governed exclusively by Sec. 602(a)(7) and its implementing regulations. We observed then:
 [W]e think it entirely reasonable for the Secretary to interpret "earned income" in the Act's disregard provisions, 42 U.S.C. Sec. 602(a)(8)(A), as referring to gross earned income. Nothing in the legislative history negates this broader reading of "earned income," and common usage supports it.
 Id. at 470 n. 21 (emphasis added). Arizona v. HEW thus construes a statutory provision which has passed out of existence and grounds in deference to the Secretary. We explain infra why we believe that deference is inappropriate on this issue in the instant case. Moreover, the legislative history briefly outlined above, while fully supportive of the Arizona v. HEW result, does not support the post-OBRA interpretation which the agency now advances in Turner. For all three of these reasons, we think that Arizona v. HEW is in no way helpful in attempting to understand the problem presented by Turner.
 
 
 [11]
 The defendants rely heavily on Shea in their argument that mandatory payroll deductions are work-related expenses and that such expenses must be taken from gross income. See Bell v. Hettleman, 558 F.Supp. at 391; Dickenson v. Petit, 536 F.Supp. at 1112 & 1114. We do not find Shea at all helpful to defendants, however. Dickenson does not really rely on Shea, but rather says only that Shea "implies" such an idea and asserts that its own decision is within "the penumbra" of Shea. Id. Even this cautious line is, we think, overstated; the only reference within Shea which even arguably characterizes such deductions as work expenses is grammatically ambiguous. Shea, 416 U.S. at 254-55 & n. 3, 94 S.Ct. at 1750-1755 & n. 3; Turner, 559 F.Supp. at 612-13 n. 6
 The holding of Shea, that work expenses cannot be compensated for AFDC recipients in flat sum amounts because the Act required full compensation for any reasonably work-related expenses, has been legislatively overruled, leaving the case as doubtful authority at best. To the extent that Shea survives overruling by OBRA, it seems to us to stand for the twin propositions that in construing AFDC legislation one looks to its wording and the intent of Congress in its enactment. Thus, Shea seems to us to support the position of the plaintiffs in this litigation, as we explain in section D of this opinion infra.
 
 
 [12]
 See testimony of Christine Pratt-Marston for the National Anti-Hunger Coalition, Administration's Proposed Savings in Unemployment Compensation, Public Assistance, and Social Services Programs: Hearings Before the Subcommittee on Public Assistance and Unemployment Compensation of the Committee on Ways and Means, House of Representatives, 97th Cong., 1st Sess. 88-89 (1981); Testimony of Marian Wright Edelman, President, Children's Defense Fund, Spending Reduction Proposals, Hearings Before the Committee on Finance, United States Senate, Part 1, 97th Cong., 1st Sess. 277 (1981). Portions of their testimony are reprinted in Bell v. Hettleman, 558 F.Supp. at n. 16
 
 
 [13]
 See, e.g., California Department of Social Services, AFDC Social and Economic Characteristics for Families Who Received Aid during July 1980, Program Series Information Report 1982-01, Table 18 (January 1982), which reports that in July 1980, average monthly transportation for California's working AFDC recipients was $48. That figure, as well as being three years old, was low to begin with. Green v. Obledo, 29 Cal.3d 126, 139, 172 Cal.Rptr. 206, 624 P.2d 256 (1981)
 
 
 [14]
 According to the Center for the Study of Social Policy, as extensively reported by the U.S. Civil Rights Commission in May 1983, under the present method of calculating AFDC benefits established under the 1982 post-OBRA regulations, AFDC recipients in twelve states, including California, lose money if they work. Those in another nine states earn less than $10 in extra income for a full month of work. In only four states was the amount of increased income greater than $100 and that occurred because the basic benefits were set at a low level in those states. United States Commission on Civil Rights, A Growing Crisis: Disadvantaged Women and Their Children (May 1983) at 28-29 & Table 3.8
 
 
 [15]
 The state asserts as well that if the district court interpretation of the law is implemented, the OBRA amendments will cost the government money rather than saving it. It relies on an affidavit of HHS AFDC official Linda S. McMahon to buttress this assertion. The affidavit is unclearly worded and, perhaps because of this, seems internally contradictory. Compare paragraph # 4 with paragraph # 5. Moreover, the assertion which the state and Ms. McMahon make is patently untrue in that they make no allowance for OBRA's chief economizing feature, the repeal of the old work incentive disregard. See example supra at 1122-1123. See Bell v. Hettleman, 558 F.Supp. at 393-94 n. 12 (similar affidavit not relied upon)
 
 
 [16]
 Turner, 559 F.Supp. at 615-16 n. 11; Vaessen v. Woods, 131 Cal.App.3d 1025, 182 Cal.Rptr. 725 (1982), hearing & alternative writ of mandate granted (Aug. 9, 1982) (Nos. LA 31617 & LA 31602)