724 F.2d 789
 Patricia Ann BROTHERS, Plaintiff-Appellant,
v.
FIRST LEASING, and Does 1 through 20, inclusive, Defendants-Appellees.
 No. 82-4584.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted June 13, 1983.
Decided Jan. 24, 1984.
As Amended March 14, 1984.
 
 William T. Murphy, Law Offices of Chris A. Schaefer, San Rafael, Cal., for plaintiff-appellant.
 Pamela R. Grove, Ralph Mendelson, Davis, Young & Mendelson, Alameda, Cal., for defendants-appellees.
 Appeal from the United States District Court for the Northern District of California.
 Before ALARCON, CANBY, and REINHARDT, Circuit Judges.
 REINHARDT, Circuit Judge:
 
 
 1
 The district court dismissed plaintiff's claim that her application for an automobile lease had been denied on the basis of sex or marital status in violation of the Equal Credit Opportunity Act (ECOA), 15 U.S.C. Secs. 1691-1691f (1982). The sole issue on appeal is whether the ECOA applies to consumer leases. We hold that it does.
 
 
 2
 In January 1982, plaintiff-appellant, Patricia Ann Brothers, attempted to lease an automobile for her personal use from defendant-appellee, First Leasing.[1] First Leasing required Brothers to submit a completed "Application for Lease Credit," which was to provide First Leasing with information with which to evaluate her financial condition.
 
 
 3
 Brothers informed First Leasing that she intended to lease the automobile in her own name rather than jointly with her husband, James A. Garske.[2] Nonetheless, First Leasing insisted that Brothers include on the "Application for Lease Credit" information concerning Mr. Garske's financial history. In addition, First Leasing required Mr. Garske, as well as Brothers, to sign the application. Brothers submitted the application, signed by her husband, with the requested information about his finances. First Leasing then obtained TRW Credit Reports on Brothers and her husband. Mr. Garske's credit report indicated that he previously had filed for bankruptcy.
 
 
 4
 In a form entitled "Statement of Credit Denial, Termination, or Change," which complies with the requirements of the ECOA, see 15 U.S.C. Sec. 1691(d) (1982), and is almost identical to the form suggested in the ECOA regulations, see 12 C.F.R. Sec. 202.9(b)(2) (1983), First Leasing rejected Brothers' application. The "principal reason" given for the denial of Brothers' lease credit application was her husband's previous bankruptcy. The form used by First Leasing also contained a statement that the ECOA bars "creditors from discriminating against credit applicants on the basis of sex [or] marital status."
 
 
 5
 Brothers filed a claim against First Leasing that alleged that (1) the requirement that Mr. Garske sign her lease credit application, and (2) the denial of her application because of his credit record, constitute unlawful discrimination on the basis of sex or marital status under the ECOA, 15 U.S.C. Sec. 1691(a)(1). Contending that the ECOA does not apply to leases, First Leasing moved under Fed.R.Civ.P. 12(b)(6) to dismiss the action for failure to state a claim upon which relief can be granted. The district court held that the lease was not covered by the ECOA and granted the motion. We reverse.[3]
 
 
 6
 * The Equal Credit Opportunity Act (ECOA) is Title VII of the Consumer Credit Protection Act, 15 U.S.C. Secs. 1601-1693r (1982). As amended, the Consumer Credit Protection Act is a comprehensive statute designed to protect consumers by requiring full disclosure of financial terms in most credit transactions, making unlawful the use of certain unethical practices in the garnishment of wages and debt collection, regulating the transfer of funds by electronic means, and prohibiting discrimination in credit transactions. As originally passed in 1974, Title VII, the ECOA, prohibited discrimination by any creditor "against any applicant, with respect to any aspect of a credit transaction ... on the basis of ... sex or marital status." 15 U.S.C. Sec. 1691(a)(1). Congress later amended the ECOA to add prohibitions against discrimination on the basis of race, color, religion, national origin, and age. Pub.L. No. 94-239, 90 Stat. 251 (1976). The ECOA, on its face, applies to all "credit transactions."
 
 
 7
 The Consumer Credit Protection Act requires disclosure in various types of financial transactions. Title I, the Truth in Lending Act (TILA), 15 U.S.C. Secs. 1601-1666j (1982),[4] enacted in 1968, requires full disclosure of credit terms by a creditor prior to entering into consumer loans or "credit sales" of property or services. The Consumer Leasing Act (CLA), 15 U.S.C. Secs. 1667-1667e (1982), subsequently enacted[5] as a subchapter of the Truth in Lending Act,[6] requires lessors to meet similar disclosure requirements prior to entering into consumer leases.[7]
 
 
 8
 Both the enactment of the requirement for financial disclosure in consumer lease transactions and the amendment of the ECOA to include discrimination based on characteristics other than sex and marital status occurred in 1976. Although both bills were considered by the same committees in the House and Senate and were adopted on the same day, Congress did not include any specific reference to leases in the amendments to the ECOA. First Leasing contends that this failure indicates a Congressional intent not to include leases within the reach of the ECOA.
 
 
 9
 The issue, then, is whether the ECOA applies only to the Truth in Lending Act or to the Consumer Leasing Act as well. We are aware of no other case in which a court has addressed this question.
 
 II
 
 10
 "In construing a statute in a case of first impression, the courts look to the traditional signposts for statutory interpretation: first, the language of the statute itself; and second, its legislative history and the interpretation given it by its administering agency ...." Turner v. Prod, 707 F.2d 1109, 1114 (9th Cir.1983). "[T]he legislative and administrative histories are usually pursued in an effort to ascertain something more important, the purpose of Congress in enacting a specific piece of legislation. If a court can ascertain that purpose, it is usually dispositive of an issue of statutory construction." Id. at 1121 (citations omitted); see id. at 1114-21; see, e.g., Rose v. Lundy, 455 U.S. 509, 517-18, 102 S.Ct. 1198, 1202-03, 71 L.Ed.2d 379 (1982); Chapman v. Houston Welfare Rights Organization, 441 U.S. 600, 608, 99 S.Ct. 1905, 1911, 60 L.Ed.2d 508 (1979); United States v. Sisson, 399 U.S. 267, 297-98, 90 S.Ct. 2117, 2133-34, 26 L.Ed.2d 608 (1970); United States v. Bacto-Unidisk, 394 U.S. 784, 799, 89 S.Ct. 1410, 1418, 22 L.Ed.2d 726 (1969); Unexcelled Chemical Corp. v. United States, 345 U.S. 59, 64, 73 S.Ct. 580, 583, 97 L.Ed. 821 (1953).
 
 
 11
 The use of the broad term "credit transactions" in the ECOA does not, by itself, answer the question whether consumer leases are covered by the Act, although a literal reading of the language supports the view that they are. See United States v. Little Lake Misere Land Co., 412 U.S. 580, 593, 93 S.Ct. 2389, 2397, 37 L.Ed.2d 187 (1973) (recognizing "the inevitable incompleteness presented by all legislation"); G. Gilmore, The Ages of American Law 96-97 (1977) ("Statutory language--like any other kind of language--almost always presents alternative possibilities of construction."). On the one hand, the lease obligation that Brothers would have incurred under the automobile lease falls within the ECOA's definition of "credit."[8] So would the obligations incurred under most consumer leases. Moreover, the credit investigation engaged in by First Leasing is specifically included within the Federal Reserve Board's definition of "credit transaction."[9] On the other hand, it appears that the Consumer Credit Protection Act did not require disclosure in lease transactions until the enactment of the CLA in 1976, see note 5 supra, even though the term "credit transactions" appeared prior to that time in some parts of the Truth in Lending Act. On this basis, a strong argument can be made that (1) the use of the term "credit transactions" is not conclusive with respect to the issue before us, and (2) the ECOA, did not, at least initially, apply to consumer leases.
 
 
 12
 We think it unclear whether the ECOA applied to consumer leases between 1974, when it was first enacted, and 1976, when the CLA was adopted. However, we need not resolve that academic question since we conclude that whether or not the ECOA applied prior to the enactment of the CLA, it applies now.
 
 
 13
 Although "credit transactions" might in some contexts lend itself to a narrow interpretation, we cannot give it such a construction in the ECOA in view of the overriding national policy against discrimination that underlies the Act and in view of the current structure of the Consumer Credit Protection Act, the umbrella statute. We must construe the literal language of the ECOA in light of the clear, strong purpose evidenced by the Act and adopt an interpretation that will serve to effectuate that purpose. See Addison v. Holly Hill Fruit Products, Inc., 322 U.S. 607, 617, 64 S.Ct. 1215, 1221, 88 L.Ed. 1488 (1944) ("If legislative policy is couched in vague language, easily susceptible of one meaning as well as another ... we should not stifle a policy by a pedantic or grudging process of construction."); Fong v. Immigration and Naturalization Service, 308 F.2d 191, 195 (9th Cir.1962) (quoting Addison v. Holly Hill Fruit Products ). In fact, "[i]t is a well-established canon of statutory construction that a court should go beyond the literal language of a statute if reliance on that language would defeat the plain purpose of the statute." Bob Jones University v. United States, --- U.S. ----, 103 S.Ct. 2017, 2025, 76 L.Ed.2d 157 (1983); see United Steelworkers v. Weber, 443 U.S. 193, 201, 99 S.Ct. 2721, 2726, 61 L.Ed.2d 480 (1979) (quoting Holy Trinity Church v. United States, 143 U.S. 457, 459, 12 S.Ct. 511, 512, 36 L.Ed. 226 (1892)).
 
 
 14
 Preliminarily, we note that there is nothing in the literal language or the legislative history of the CLA, or of the ECOA, including the 1976 amendments, that suggests that the ECOA does not apply to the CLA.[10] We also note that in interpreting other titles of the Consumer Credit Protection Act, we have found an examination of the purpose of the particular title to be crucial to our decision. See Donovan v. Southern California Gas Co., 715 F.2d 1405, 1408 (9th Cir.1983) (per curiam); Hutchings v. Beneficial Finance Co., 646 F.2d 389, 392 (9th Cir.1981); Eby v. Reb Realty, Inc., 495 F.2d 646, 650 (9th Cir.1974).
 
 
 15
 "The purpose of the ECOA is to eradicate credit discrimination waged against women, especially married women whom creditors traditionally refused to consider for individual credit." Anderson v. United Finance Co., 666 F.2d 1274, 1277 (9th Cir.1982) (citing Markham v. Colonial Mortgage Service Co., 605 F.2d 566, 569 (D.C.Cir.1979)); see Pub.L. No. 93-495 Sec. 502, 88 Stat. 1500, 1521 (1974); Miller v. American Express Co., 688 F.2d 1235, 1239 (9th Cir.1982). See generally National Commission on Consumer Finance, Consumer Credit in the United States (1972) (noting that many groups, particularly women, historically have been discriminated against in the extension of credit).[11] Congress reaffirmed the goal of antidiscrimination in credit in the 1976 amendments to the ECOA by adding race, color, religion, national origin, and age to sex and marital status as characteristics that may not be considered in deciding whether to extend credit. See Pub.L. No. 94-239, 90 Stat. 251 (1976); S.Rep. No. 589, 94th Cong., 2d Sess. 1, 4, 13 (1976), reprinted in 1976 U.S.Code Cong. & Ad.News 403, 406, 415.
 
 
 16
 In enacting and amending the ECOA, Congress recognized that a prohibition against discrimination in credit provides a much-needed addition to the previously existing strict prohibitions against discrimination in employment, housing, voting, education, and numerous other areas. The ECOA is simply one more tool to be used in our vigorous national effort to eradicate invidious discrimination "root and branch" from our society. See Green v. County School Board, 391 U.S. 430, 438, 88 S.Ct. 1689, 1694, 20 L.Ed.2d 716 (1968); Fullilove v. Klutznick, 448 U.S. 448, 472-92, 100 S.Ct. 2758, 2771-2781, 65 L.Ed.2d 902 (1980) (plurality opinion); United Steelworkers v. Weber, 443 U.S. 193, 200-08, 99 S.Ct. 2721, 2725-2730, 61 L.Ed.2d 480 (1979).
 
 
 17
 In view of the strong national commitment to the eradication of discrimination in our society, we see no reason why Congress would have wanted to subject the leasing of durable consumer goods to regulation under the disclosure provisions of the Consumer Credit Protection Act, but to exclude those transactions from the scope of the antidiscrimination provisions of that Act. Certainly, abolishing discrimination in the affording of credit is at least as important as compelling the disclosure of information regarding finance charges. To conclude that discrimination in consumer leasing transactions is exempt from the ECOA simply because Congress did not add express language covering consumer leases when it amended the ECOA for entirely unrelated reasons would be inconsistent with the broad purpose of the statute and the liberal construction we must give it. It is far more reasonable to conclude that Congress thought that an express amendment was unnecessary because the ECOA on its face applies to all credit transactions and, therefore, the language already in the Act was broad enough to cover consumer leases.
 
 
 18
 In enacting the Consumer Leasing Act, Congress explicitly recognized the "recent trend toward leasing automobiles and other durable goods for consumer use as an alternative to installment credit sales." See 15 U.S.C. Sec. 1601(b). Prospective lessors run extensive credit checks on consumer lease applicants just as they do in the case of credit sales applicants. The problems of persons discriminated against with respect to credit under the Truth in Lending Act and the CLA are for the most part identical. Therefore, interpreting "credit transactions" so that the ECOA applies to lease transactions, as well as to credit sales and loans, is essential to the accomplishment of the Act's antidiscriminatory goal.
 
 
 19
 We turn now to an analysis of the statutory scheme. The CLA is a part of a comprehensive act regulating numerous financial transactions. The ECOA is a later part of that same comprehensive statute. We must view the umbrella act, the Consumer Credit Protection Act, as a whole and not as separate unrelated parts.[12] We must also treat the amendments to the statute as if they were adopted as part of the original enactment.[13] When the ECOA is examined in that light, it becomes evident that it applies to all transactions covered by Title I of the Consumer Credit Protection Act. The statutory scheme is wholly inconsistent with the view that the ECOA applies to one part of Title I, the Truth in Lending Act, but not to another, the CLA. Moreover, any doubt as to this point is removed when we consider the fact that the CLA was enacted and codified as a subchapter of the Truth in Lending Act, and not as a separate measure. See note 6 supra.
 
 
 20
 Finally, to interpret the term "credit transactions" narrowly, so as to exclude consumer leases, would nullify Congress' use of flexible language necessary "to insure the effective application of legislative policy to changing circumstances." 1A J. Sutherland, note 13 supra Sec. 21.16, at 95. While the all-inclusive language of the ECOA may be read as suggesting that Congress intended the scope of its antidiscriminatory provisions to be even broader than the scope of the Truth in Lending Act and the CLA,[14] we need not consider that question here. We hold only that Congress intended to make the ECOA's antidiscrimination provisions applicable to all transactions covered by the Consumer Credit Protection Act, whether those transactions were covered under the initial form of the Act or as a result of the subsequent amendments.[15]
 
 
 21
 Because the language of the ECOA is broad and its antidiscriminatory purpose is overriding, and because the Consumer Leasing Act and the ECOA are part of a comprehensive umbrella statute designed to protect the interests of consumers, we conclude that the ECOA applies to consumer leases.[16]
 
 
 22
 The district court's order dismissing appellant's claim is reversed and the case is remanded for further proceedings consistent with this opinion.
 
 CANBY, Circuit Judge, dissenting:
 
 23
 With all respect to the majority opinion and to the laudable goal that it embraces, I must dissent. As I view the statutory structure, Congress has legislated less expansively than the majority holds. To illuminate my point, it is necessary briefly to review the sequence of enactment of some of the components of what is now the umbrella Consumer Credit Protection Act, 15 U.S.C. Secs. 1601-1693r (1982).
 
 
 24
 In 1968, Congress passed the Truth in Lending Act, 15 U.S.C. Secs. 1601-1666j. That Act imposed extensive requirements of disclosure to be made by creditors in connection with "consumer credit transactions." Id. at Sec. 1631. "Credit" as used in that phrase was defined as "the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment." Id. at Sec. 1602. It was clear from the legislative history that Congress did not intend this definition to apply to lease transactions, see majority opinion n. 5, and the Truth in Lending Act was not so applied.
 
 
 25
 In 1974, Congress enacted the Equal Credit Opportunity Act, 15 U.S.C. Secs. 1691-1691f (1982). That Act forbade discrimination on the basis of sex or marital status with respect to any aspect of a "credit transaction." "Credit" was defined as "the right granted by a creditor to debtor to defer payment of debt or to incur debts and defer its payment or to purchase property or services and defer payment therefor." Except for the addition of language to cover credit sales,[1] this is the same definition that was contained in the Truth in Lending Act. Not surprisingly, there does not appear to have been any attempt to extend the Equal Credit Opportunity Act to lease transactions at that time.
 
 
 26
 The Federal Reserve Board, which was charged with administering the Truth in Lending Act, urged Congress to amend the Act to cover lease transactions. Congress responded in 1976 by passing the Consumer Leasing Act, 15 U.S.C. Secs. 1667-1667e, as an amendment to the Truth in Lending Act. That Act imposed disclosure requirements upon lessors in connection with "consumer leases." A "consumer lease" was defined as a lease of personal property for a period in excess of four months and for a total contractual obligation of less than $25,000. Id. at Sec. 1667. The disclosure requirements of the original Truth in Lending Act were also amended to apply to lessors in consumer leases. Id. at Sec. 1631. The result of these amendments was thus expressly to impose disclosure requirements on limited types of leases, in addition to the disclosures previously required in connection with "credit transactions."
 
 
 27
 On the same day that Congress passed the Consumer Leasing Act, it amended the Equal Credit Opportunity Act to include discrimination based on race, color, religion, national origin and age. It did not amend the definition of "credit" or otherwise modify the scope of the Act's coverage.
 
 
 28
 This sequence of legislative events virtually compels the conclusion that Congress viewed "credit" transactions and "lease" transactions as two distinct and mutually exclusive categories. Both the Truth in Lending Act and the Equal Credit Opportunity Act in their original forms covered only "credit" transactions. Congress expanded Truth in Lending by expressly extending its coverage to consumer lease transactions. It made no such change in coverage for the Equal Credit Opportunity Act. That Act consequently does not apply to leases.
 
 
 29
 The majority concludes nevertheless that "credit transactions" in the Equal Credit Opportunity Act includes leases, even though "credit transactions" in the Truth in Lending Act does not. Or, if that is not the majority's position, it is that, while "credit transactions" in the Equal Credit Opportunity Act may not originally have included leases, it did so after passage of the Consumer Leasing Act in 1976. But there is nothing in the Consumer Leasing Act to suggest that Congress was making such a change. Indeed, the whole purpose of passing the Consumer Leasing Act was to add lease transactions to the coverage of the Truth in Lending Act because they were not included in that Act's original "credit transactions" coverage.
 
 
 30
 The majority justifies its expansive interpretation of "credit transactions" in the Equal Credit Opportunity act by emphasizing the importance of the national goal of non-discrimination. There is much appeal to this invocation. Discrimination in financial transactions on the basis of sex or marital status, like that based on race, national origin or religion, is unquestionably odious. Moreover, the facts alleged in this case seem to fall within the spirit of the Equal Credit Opportunity Act. But this line of reasoning amounts in the end to a declaration that Congress should have included leases within the coverage of the Equal Credit Opportunity Act, or that Congress would have done so if it had directed its attention to the problem. The deficiency, however, ought to be left to Congress to correct, because the majority's solution to the problem will expand the coverage of the Act well beyond anything Congress has thus far intended.
 
 
 31
 The majority holds that the lease in this case is a "credit transaction" because it is a payment of a "deferred debt" within the meaning of Sec. 1691a(d). Majority opinion n. 8, supra. Its rationale is that the lease would have involved a total obligation to pay over $16,000 and this obligation is deferred to be paid monthly over four years. This contention is not inherently illogical, but it proves too much. It means that every lease is a credit transaction within the meaning of the Equal Credit Opportunity Act.[2] The majority's actual holding is that the Equal Credit Opportunity Act applies to consumer lease transactions. Yet there is nothing in the majority's rationale that confines the coverage of that Act to consumer lease transactions as defined in the Consumer Leasing Act. If a lease is a "credit transaction," then every lease, whether of personal property or real estate, whether for obligations in excess of $25,000 or not, and whether for terms in excess of four months or not, are covered by the Equal Credit Opportunity Act. It is true that the majority has not said that such an expansion of coverage will follow from their decision, but it certainly is compelled by its rationale.
 
 
 32
 It is true that ending discrimination in all leasing is a highly desirable policy goal. It cannot sensibly be argued, however, that Congress intended to accomplish that goal by any of the provisions found under the umbrella of the Consumer Credit Protection Act. The only leases brought within its coverage, for purposes of disclosure, are a limited group of personal property leases. It is impossible to accept the proposition that Congress, by its silence in passing the Consumer Leasing Act or amending the Equal Credit Opportunity Act in 1976, somehow expanded the latter Act to a coverage far beyond that accorded to leases under any provisions it had thus far enacted.
 
 
 33
 The majority may say that it would not so expand the coverage of the Equal Credit Opportunity Act, but would confine the coverage to consumer leases. The fact that the majority's rationale dictates a more expansive application, however, suggests that the majority has simply interpreted the statute incorrectly. The interpretation that effectuates the intent of Congress, I submit, is that "credit transactions" do not include leases, and that leases are not deferred debts but payments (normally in advance) for contemporaneous use. However desirable the result reached by the majority, and I emphasize that it is desirable, it can properly be reached only by Congress. I therefore regretfully dissent.
 
 
 
 [1]
 For purposes of reviewing the district court's dismissal for failure to state a claim upon which relief can be granted, we must accept all material allegations in Brothers' complaint as true and must construe them in the light most favorable to her. See Jenkins v. McKeithen, 395 U.S. 411, 421, 89 S.Ct. 1843, 1848, 23 L.Ed.2d 404 (1969) (plurality opinion); Benson v. Arizona State Bd. of Dental Examiners, 673 F.2d 272, 275 & n.7 (9th Cir. 1982); Lodge 1380, Bhd. of Ry., Airline & Steamship Clerks v. Dennis, 625 F.2d 819, 825 (9th Cir. 1980)
 Here, Brothers applied for the lease in her own name, rather than in the name of her business, Brothers Insurance Service. In addition, it appears that Brothers, by applying separately for credit instead of jointly with her husband, sought to establish her own credit. Accordingly, for purposes of our review here, we infer from her allegations that Brothers sought to lease the automobile for her personal use. Even if we were unable to infer that from her allegations, we would be required to conclude that the district court erred in dismissing the complaint with prejudice. If the complaint failed to indicate whether or not Brothers applied for the lease of the vehicle for her personal use, the district court should at most have dismissed the claim with leave to amend and thus have afforded Brothers the opportunity to attempt to cure any defect in the pleading.
 
 
 [2]
 Brothers sought to lease a 1982 Mercedes Benz 300 Diesel Turbo automobile for 48 months. Besides the four year obligation, Brothers might have been obligated under the lease to pay First Leasing more money at the end of the lease, depending on the resale value of the automobile at that time
 
 
 [3]
 It is necessary on this appeal to hold only that the ECOA applies to consumer leases. We note, however, that we have previously held that, absent a showing that state law requires the signature to create a valid lien, requiring a spouse's signature on credit instruments is unlawful discrimination on the basis of marital status under the ECOA. Anderson v. United Finance Co., 666 F.2d 1274, 1276-77 & n.1 (9th Cir. 1982). In Anderson, we did not reach the question "whether spouses could be compelled to sign notes if state law required their signature to create a valid lien." Id. at 1276 n.1 (citation omitted)
 
 
 [4]
 The other Titles of the Consumer Credit Protection Act as amended are: Title II--Extortionate Credit Transactions, Title III--Restriction on Garnishment, Title IV--National Commission on Consumer Finance, Title V--General Provisions, Title VI--Fair Credit Reporting Act, Title VIII--Fair Debt Collection Practices Act, and Title IX--Electronic Fund Transfers
 
 
 [5]
 The Federal Reserve Board, contending that the TILA did not apply to leases, urged Congress to enact the CLA. See, e.g., Board of Governors of the Federal Reserve System, Annual Report 244-45 (1974). The Board's position finds more support in the legislative history than in the language of the statute. Even though a statute's legislative history often is more vague than the statute that the court is interpreting, see United States v. Public Utilities Comm'n, 345 U.S. 295, 320, 73 S.Ct. 706, 720, 97 L.Ed. 1020 (1953) (Jackson, J., concurring); United Steelworkers v. Weber, 443 U.S. 193, 229-30, 99 S.Ct. 2721, 2740-41, 61 L.Ed.2d 480 (1979) (Rehnquist, J., dissenting), the legislative history here strongly suggests that the TILA as enacted in 1968 was not designed to apply to leases. See Landers, The Scope and Coverage of the Truth in Lending Act, 1976 Am.B.Found.Research J. 565, 629-39
 
 
 [6]
 Although the CLA is a part of the TILA, when we refer to the TILA in this opinion we refer only to the non-CLA part of the Act. We do so in order to avoid the confusion that might otherwise arise when we analyze separately the applicability of the ECOA to the principal part of the TILA and to the CLA part
 
 
 [7]
 The CLA defines a consumer lease as
 a contract in the form of a lease or bailment for the use of personal property ... for a period of time exceeding four months, and for a total contractual obligation not exceeding $25,000, primarily for personal, family, or household purposes, whether or not the lessee has the option to purchase or otherwise become the owner of the property at the expiration of the lease ....
 15 U.S.C. Sec. 1667(1). Construing the material allegations in the complaint in the light most favorable to her, as we must for purposes of reviewing a dismissal for failure to state a claim upon which relief can be granted, see note 1 supra, we infer that Brothers applied for a consumer lease under the CLA. More specifically, we construe the pleadings as relating to a proposed lease involving an obligation of less than $25,000, for a period exceeding four months, and for personal or family purposes.
 
 
 [8]
 The ECOA defines credit as "the right granted by a creditor to a debtor to defer payment of debt or to incur debts and defer its payment or to purchase property or services and defer payment therefor." 15 U.S.C. Sec. 1691a(d) (1982). Under the terms of the lease that Brothers applied for, she would have been obligated to pay a total amount of $16,280.16. Payment of that debt would have been deferred, and Brothers would have been required to make 48 monthly installment payments of $339.17
 
 
 [9]
 The Federal Reserve Board, given the power to promulgate regulations to enforce the ECOA, see 15 U.S.C. Sec. 1691b(a), has defined a "credit transaction" as "every aspect of an applicant's dealings with a creditor regarding an application for, or an existing extension of, credit including, but not limited to, information requirements; investigation procedures; standards of creditworthiness; terms of credit; furnishing of credit information; revocation, alteration, or termination of credit; and collection procedures." 12 C.F.R. Sec. 202.2(m) (1983)
 
 
 [10]
 The legislative history contains no discussion of the applicability or non-applicability of the ECOA to consumer leases. See, e.g., S.Rep. No. 589, 94th Cong., 2d Sess. (1976), reprinted in 1976 U.S.Code Cong. & Ad.News 403; S.Rep. No. 902, 93d Cong., 2d Sess. (1974), reprinted in 1974 U.S.Code Cong. & Ad.News 6119; S.Rep. No. 590, 94th Cong., 2d Sess. (1976), reprinted in 1976 U.S.Code Cong. & Ad.News 431
 
 
 [11]
 Congress also recognized that
 [e]conomic stabilization would be enhanced and competition among the various financial institutions and other firms engaged in the extension of credit would be strengthened by an absence of discrimination on the basis of sex or marital status, as well as by the informed use of credit which Congress has heretofore sought to promote.
 Pub.L. No. 93-495 Sec. 502, 88 Stat. 1500, 1521 (1974).
 
 
 [12]
 See United States v. Heirs of Boisdore, 49 U.S. (8 How.) 113, 121, 12 L.Ed. 1009 (1849) ("In expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy."); see, e.g., Pennhurst State School & Hospital v. Halderman, 451 U.S. 1, 18-19, 101 S.Ct. 1531, 1540-1541, 67 L.Ed.2d 694 (1981); Adams v. Howerton, 673 F.2d 1036, 1040-41 (9th Cir.), cert. denied, 458 U.S. 1111, 102 S.Ct. 3494, 73 L.Ed.2d 1373 (1982); Pacific Legal Foundation v. State Energy Resources Conservation & Development Commission, 659 F.2d 903, 926 (9th Cir.1981), aff'd sub nom., Pacific Gas & Electric Co. v. State Energy Resources Conservation & Development Commission, --- U.S. ----, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983)
 
 
 [13]
 See Blair v. City of Chicago, 201 U.S. 400, 475, 26 S.Ct. 427, 446, 50 L.Ed. 801 (1906); Bailey v. Tarr, 469 F.2d 409, 412 (9th Cir.1972) (quoting Blair v. City of Chicago ); 1A J. Sutherland, Statutes and Statutory Construction Secs. 22.34-22.35, at 196-200 (C. Sands 4th ed. 1972)
 
 
 [14]
 The language of the ECOA is much broader than that of the TILA: "A transaction, to come within the terms of [the TILA], usually must involve a finance charge or installment payments, must involve an individual, must have a consumer purpose, and the amount involved cannot exceed a limited figure. At least initially, the ECOA imposes no such limits." Maltz & Miller, The Equal Credit Opportunity Act and Regulation B, 31 Okla.L.Rev. 1, 2-3 (1978) (footnotes omitted). Similarly, the language of the ECOA is broader than that of the CLA. The CLA applies only to consumer leases that would extend for a period of over four months and involving an obligation not exceeding $25,000. 15 U.S.C. Sec. 1667(1). The language of the ECOA, on its face, imposes no such limitations on "credit transactions."
 
 
 [15]
 Despite the use of the all-inclusive term "credit transaction" in the ECOA, a staff member of the Federal Reserve Board, in an unofficial staff interpretation, took the position that a lease is subject to that Act "only if it meets the criteria for a 'credit sale.' " Federal Reserve Board Staff Interpretations, No. 7 (August 17, 1977), reprinted in R. Clontz, Equal Credit Opportunity Manual Appendix E-34 (3d ed. 1983). Although a regulation issued by the Board is entitled to substantial deference, see, e.g., Western Pioneer, Inc. v. United States, 709 F.2d 1331, 1335 (9th Cir.1983), an unofficial interpretation by a staff member of the Federal Reserve Board is "hardly binding on a court," Eby v. Reb Realty, Inc., 495 F.2d 646, 650 (9th Cir.1974); see Thomas v. Myers-Dickson Furniture Co., 479 F.2d 740, 747 (5th Cir.1973); Davis v. Colonial Securities Corp., 541 F.Supp. 302, 305 (E.D.Pa.1982). Although a court may find an unofficial staff interpretation to be persuasive, Eby, 495 F.2d at 650; see Skidmore v. Swift & Co., 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944) (listing factors that give an interpretation persuasive power; quoted in Eby, 495 F.2d at 650 & n. 6), the interpretation before us does not set forth any reasoning in support of its position and is not based on any prior agency decision. Rather, the "interpretation" only states a conclusion. Moreover, it does not appear to have considered in any way the broad language of the ECOA, the effect of the passage of the CLA on the ECOA, or the compelling antidiscriminatory purpose behind the ECOA. Because of these inadequacies, we do not find the unofficial staff interpretation persuasive
 On remand, First Leasing may attempt to assert an affirmative defense to Brothers' claim under 15 U.S.C. Sec. 1691e(e) by alleging that it relied upon the unofficial staff interpretation. The words of Sec. 1691e(e), however, suggest that the defense is available only when a party relies upon an official agency interpretation. Moreover, the Federal Reserve Board's regulations state that "[u]nofficial staff interpretations will be issued at the staff's discretion where the protection of [15 U.S.C. Sec. 1691e(e) ] is neither requested nor required, or where a rapid response is necessary." 12 C.F.R. Sec. 202.1(d)(1) (1983); see Landers, note 5 supra, at 567. Thus, ordinarily, reliance on an unofficial staff interpretation would be unreasonable and could not be the basis for an affirmative defense under 15 U.S.C. Sec. 1691e(e).
 
 
 [16]
 Given our holding, we need not decide whether the lease transaction also constituted a "credit sale" under 15 U.S.C. Sec. 1602(g)
 
 
 [1]
 Appellant in her brief states that she is not suggesting that the lease transaction in issue was a credit sale. Appellant's brief, p. 9
 
 
 [2]
 Indeed, the majority's reasoning might well find a "deferred debt" in any executory contract calling for the eventual payment of money, thus making those contracts "credit transactions" subject to the Equal Credit Opportunity Act