**Mark P. WILLIAMS, Plaintiff,**

v.

**AT & T WIRELESS SERVICES, INC., et al., Defendants.**

**No. C97–1389Z.**

United States District Court,
W.D. Washington.

Feb. 23, 1998.

Christopher E. Green, Seattle, WA, O. Randolph Bragg, Horwitz, Horwitz & Associates, Chicago, IL, for Plaintiff.

Michael E. Kipling, John Christopher Jordan, Stokes Lawrence, PS, Seattle, WA, for defendant AT & T.

Lucy Isaki, Bogle & Gates, Seattle, WA, for defendant The Future Shop.

## ORDER

ZILLY, District Judge.

THIS MATTER comes before the Court on defendant AT & T Wireless Services's

motion for summary judgment (docket no. 19); defendant Future Shop's motion for summary judgment (docket no. 25); and plaintiff Mark Williams' motion for class certification (docket no. 16). The Court, having considered the motions and all papers filed in support of and in opposition to the motions, hereby GRANTS the motions for summary judgment and STRIKES the motion for class certification as MOOT.

*Background*

On October 23, 1996, plaintiff Mark Williams applied at a Future Shop store for activation as a subscriber on AT & T Wireless Services' cellular telephone network. In response to a Future Shop employee's questions, Williams gave his name, social security number and other identifying information to the clerk. The clerk entered the information into a computer and submitted it to AT & T. AT & T then ran a credit check resulting in the generation of a consumer credit report on Williams by a credit reporting agency. As a result of the credit report, AT & T decided that it would approve Mr. Williams for service on the condition that he provide a $700 security deposit. Future Shop never saw the credit report, but was informed of AT & T's decision and passed that information on to Williams. No formal letter of notice was provided to Williams in connection with the October 23, 1996 report.

On October 25, 1996, Williams contacted AT & T and inquired "why he had been declined for credit." Complaint at ¶ 18. In response to his inquiry, the AT & T representative obtained Williams' credit report by computer. Williams declined to activate service and terminated the transaction.

Williams seeks to bring a class action, claiming that his credit report was obtained by the defendants under false pretenses and for an improper purpose, and defendants failed to notify him in writing of adverse action as required under federal and state law. Although plaintiff initially argued that the defendants violated numerous sections of the FCRA and ECOA, the plaintiff stated in his response brief that his claims are limited to (1) a violation of 15 U.S.C. § 1681q (FCRA) because the credit report was obtained without a permissible purpose, and (2)

a violation of 15 U.S.C. § 1691(d) because defendants failed to give Williams notice of the adverse action. *Discussion*

I. *The Equal Credit Opportunity Act (ECOA)*

The ECOA prohibits creditors from discriminating against any applicant on the basis of race, color, religion, national origin, sex, marital status or age. 15 U.S.C. § 1691(a). In addition to anti-discrimination provisions, the ECOA requires creditors to notify an applicant for credit of "adverse action" within thirty days. 15 U.S.C. § 1691(d). The applicable statute provides that "[e]ach applicant against whom adverse action is taken shall be entitled to a statement of reasons for such action from the creditor." 15 U.S.C. § 1691(d)(2). The statement must be in writing. *Id.* The term "adverse action" is defined as "a denial or revocation of credit, a change in the terms of an existing credit arrangement, or a refusal to grant credit in substantially the amount or on substantially the terms requested." 15 U.S.C. § 1691(e).

Defendants argue that because the transaction at issue did not involve "credit," the ECOA does not apply. The regulations interpreting the ECOA provide that a "credit transaction" means "every aspect of an applicant's dealings with a creditor regarding an application for credit or an existing extension of credit .... " 12 C.F.R. § 202.2(m). Section 1691a(d) of the ECOA defines "credit" as "the right granted by a creditor to a debtor to defer payment of debt or to incur debts and defer its payment or to purchase property or services and defer payments therefor." Regulation B, which addresses equal credit opportunity, similarly provides that "[c]redit means the right granted by a creditor to an applicant to defer payment of a debt, incur debt and defer its payment, or purchase property or services and defer payment therefor." 12 C.F.R. § 202.2(j). The Official Staff Commentary on Regulation B's definition of credit provides:

Regulation B covers a wider range of credit transactions than Regulation Z (Truth in Lending). For purposes of Regulation B a transaction is credit if there is a right to

defer payment of a debt—regardless of whether the credit is for personal or commercial purposes, the number of installments required for repayment, or whether the transaction is subject to a finance charge.

Official Staff Interpretation of § 202.2(j) of Regulation B, 12 C.F.R. Pt. 202, Supp. I.

There is no authority addressing whether an application for cellular phone service is a "credit" transaction under the ECOA. Cases dealing with other types of transactions have made clear, however, that a transaction does not involve "credit" under the ECOA unless there is a deferral of payment. *See, e.g., Dunn v. American Express Co.,* 529 F.Supp. 633, 634 (D.Colo.1982) (application for a teller card did not involve a credit transaction because "there [was] simply no evidence that anything that she applied for would have given her the right to defer the payment of any debt."); *Butler v. Capitol Federal Savings,* 904 F.Supp. 1230, 1234 (D.Kan.1995) (plaintiff's application to open a savings account is not a credit transaction because it is not a right to defer payment of a debt). Although some courts have stated that there must be a deferral of "debt" in order to have a "credit transaction" under the ECOA, the Sixth Circuit recently noted that the existence of "debt" is not required. In *Barney v. Holzer Clinic, Ltd.,* 110 F.3d 1207, 1211–12 (6th Cir.1997), the Sixth Circuit recognized that there are three types of credit included in the ECOA's definition of "credit": (1) the right "to defer payment of a debt," (2) the right to "incur debt and defer its payment," and (3) the "right to purchase property or services and defer payment therefor." Only the first two alternatives specify "debt" as a necessary element. The third alternative does not. It requires only the deferral of "payment," not the existence of "debt." *Id.*

█ The Court concludes that the consumer's application to purchase cellular telephone service is a "credit" transaction governed by the ECOA because the transaction involves the purchase of services and deferral of payment for those services. The defen-

dants emphasize that AT & T bills for cellular services on a monthly basis, and that subscribers cannot defer payment of amounts owed. They argue that the regularity and frequency of billing means that payment is substantially contemporaneous with the use of service and hence there is no deferral of payment. It is true that once the subscriber is billed for services he has used, he cannot defer payment. The transaction at issue here, however, involves the application process for becoming an AT & T subscriber. Williams had to *apply* to become an AT & T subscriber, and his right to purchase cellular services and defer payment therefor depended upon his ability to pay for those services as reflected in his credit report. *See* AT & T's Opening Brief at 6 (Williams *"applied for* activation as a subscriber.... "); Future Shop's Opening Brief at 1 ("Complaint arises out of Plaintiff's aborted *attempt* to purchase cellular service."). When Williams applied for AT & T subscribership, he sought the right to use AT & T cellular service and pay for it later. AT & T denied him unconditional subscribership, seeking instead to ensure payment by requiring a security deposit. The regulations treat these *types* of transactions as credit transactions and specifically provide that security deposit requirements in connection with the purchase of other services, such as utilities, are covered by Regulation B.

The purchase of cellular services is most similar to the purchase of utility services, such as gas, electric or water service. In each case, the consumer incurs debt as he uses the services and is billed for the services on a periodic basis. As in this case, utility bills are usually due and payable upon receipt and cannot be deferred. As the regulations show, the purchase of utility services and a utility company's requirement of a security deposit are "credit" transactions subject to the ECOA, except as limited by certain "limiting exceptions" in the regulations.

Although AT & T Wireless does not qualify as a public utility within the meaning of the ECOA,[1] the treatment of public utilities

---

1. The ECOA defines "public utilities credit" as "extensions of credit that involve public utility services provided through pipe, wire, or other connected facilities, or radio or similar transmis-

in the ECOA and its regulations is instructive on the question of whether the ECOA's definition of "credit" would encompass the type of transaction at issue here. The Official Staff Interpretation of the definition of "public utilities credit" in Regulation B provides:

> 1. *Definition.* This definition applies only to credit for the purchase of a utility service, such as electricity, gas, or telephone service. Credit provided or offered by a public utility for some other purpose—such as financing the purchase of a gas dryer, telephone equipment, or other durable goods, or for insulation or other home improvements—is not excepted.

> 2. *Security deposits.* A utility company is a creditor when it supplies utility service and bills the user after the service has been provided. Thus, any credit term (such as a requirement for a security deposit) is subject to the regulation.

Pursuant to Regulation B, public utilities extending credit are exempt from *some, but not all,* of the provisions of the ECOA. *See* 12 CFR § 202.3(a) and Official Staff Interpretation thereof, Part 202, Supp. I. The "limited exemptions" do not except public utilities from the notice provisions at issue here.

Because the regulations treat the purchase of similar services, such as water, electricity, and phone service, as "credit" transactions, which are exempted only in part from the provisions of the ECOA, the Court concludes that a similar transaction for the purchase of cellular services on the same terms and under the same conditions would also be a

"credit" transaction covered by the ECOA unless specifically exempted by the statute or regulations.

Defendants rely on *Shaumyan v. Sidetex Co.,* 900 F.2d 16, 18 (2nd Cir.1990), in arguing that there is no deferral of payment in this case and hence no credit. *Shaumyan* is neither controlling nor persuasive, however. The issue in *Shaumyan* was whether progress payments amounted to "credit," such that the anti-discrimination provisions of ECOA applied. The court held that the ECOA did not apply because the Shaumyans' payments were "substantially contemporaneous" with the contractor's performance under the contract. *Shaumyan* is distinguishable in two important respects. First, in *Shaumyan,* the plaintiffs paid the contractor nearly half of the projected cost of the project ($7000 of $14,800) prior to the commencement of any work. By the time half the project was completed, plaintiffs had paid almost 75% of the cost of the project. If anything, the plaintiffs' payments were not merely substantially contemporaneous with the work performed, they actually preceded the work performed. In large measure, the plaintiffs prepaid for the work. Given these facts, it is understandable why the court refused to find a deferral of payment for the work performed. Second, unlike the present situation, *Shaumyan* did not involve an assessment of the creditworthiness of the plaintiffs.

Finally, the Ninth Circuit stated in *Brothers v. First Leasing,* 724 F.2d 789 (9th Cir. 1984), *cert. denied,* 469 U.S. 832, 105 S.Ct. 121, 83 L.Ed.2d 63 (1984),[2] that the ECOA

---

sion (including extensions of such facilities), *if the charges for service, delayed payment, and any discount for prompt payment are filed with or regulated by a government unit."* 12 C.F.R. § 202.3(a) (emphasis added). AT & T Wireless is not a "public utility" within the meaning of the ECOA because its charges for service, delayed payment, and discounts for prompt payment are not regulated by a government unit. *See* AWS's Reply Brief at 11–12 and authority cited therein (charges for cellular service not regulated or filed by any government unit). Plaintiff does not challenge defendants' representation that its rates and charges are unregulated.

**2.** While the Court finds that *Brothers* provides support for interpreting the ECOA broadly, it

does not resolve the specific issue here. In *Brothers,* the court considered whether the ECOA applied to consumer leases. The court concluded that given "the strong national commitment to the eradication of discrimination in our society," there was no basis for concluding that Congress wanted to subject the leasing of durable consumer goods to regulation under the disclosure provisions of the Consumer Credit Protection Act, but to exclude those transactions from the scope of the antidiscrimination provisions of that Act.

The issue here is whether applying for cellular service involves "credit" as that term is defined in the ECOA. The *Brothers* court had no difficulty finding that the lease transaction at issue in that case fell within the ECOA's definition of "credit"

should be interpreted liberally to achieve its goals. The transaction at issue here—the generation of a credit report upon the application to become a cellular phone subscriber—implicates some of the key elements of the ECOA, and there is no basis for finding that Congress wanted to exclude such transactions from the coverage of the ECOA.

■ Having concluded that the application for cellular service involves "credit," the Court must still consider whether the defendants are exempted from the notice provisions by one of the limited exemptions in Regulation B. Defendants argue that the transaction is exempted as "incidental credit" under 12 C.F.R. § 202.3(c). That section provides:

*Incidental credit.* (1) *Definition.* Incidental credit refers to extensions of consumer credit other than credit of the types described in paragraphs (a) [public utilities credit] and (b) [securities credit] of this section:

(i) That are not made pursuant to the terms of a credit card account:

(ii) That are not subject to a finance charge (as defined in Regulation Z, 12 C.F.R. § 226.4); and

(iii) That are not payable by agreement in more than four installments.

The Official Staff Interpretation of this section gives the following example of "incidental credit":

If a service provider (such as a hospital, doctor, lawyer, or retailer) allows the client or customer to defer the payment of a bill, this deferral of debt is credit for purposes of the regulation, even though there is no finance charge and no agreement for payment in installments. Because of the exceptions provided by this section, however, these particular credit extensions are excepted from compliance with certain procedural requirements as specified in the regulation.

and was therefore a credit transaction. Under the terms of the lease, Brothers would have been obligated to pay a total amount of $16,280.16. *Payment of that debt would have been deferred, however,* as the contract required her to make

12 C.F.R. Part 202, Supp. I, Official Staff Interpretation of 202.3(c). Section 202.9 of the regulations, which provides for notice of adverse action, does not apply to transactions involving "incidental credit." *See* 12 C.F.R. § 202.3(c)(2).

■ The transaction at issue here qualifies as "incidental credit" because it does not involve a credit card account, a finance charge, or installment payments. Plaintiff's sole argument against finding "incidental credit" is that AT & T is a "public utility" under subsection (a) of § 202.3, and public utilities do not qualify for "incidental credit." As previously noted, however, AT & T Wireless, which has all the attributes of a public utility, nevertheless does not meet Regulation B's definition of a public utility because its cellular rates are not filed with or regulated by any governmental unit. Because plaintiff's argument that AT & T Wireless is a "public utility" under Regulation B fails, its argument that incidental credit does not apply must also fail.

In conclusion, the Court GRANTS defendant's motion for summary judgment on plaintiff's claims under the ECOA because the transaction involves "incidental credit," which is exempt from the adverse notice requirements of Regulation B.

## II. *FCRA Claims*

Plaintiff claims that defendants violated §§ 1681b and 1681q of the Fair Credit Reporting Act in that defendants did not have a permissible purpose in obtaining Williams' credit report and they obtained that report under false pretenses. Defendants argue that § 1681b does not apply to "users" of credit reports, and therefore they cannot be held liable under that provision of the FCRA. Defendants further argue that they are not liable under § 1681q because (1) they did not mislead the consumer reporting agency, and (2) they did not request the information for an impermissible purpose.

monthly installment payments of $339.17. *Id.* at 793 n. 8. Having found that the transaction involved "credit," the Court still needed to determine whether leases were subject to the ECOA.

## A. *FCRA: Liability of Users*

Congress enacted the FCRA to "insure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy." 15 U.S.C. § 1681(a)(4). To that end, the FCRA permits consumer reporting agencies to provide subscribers with consumer credit reports only for particular purposes, including credit, licensing, employment, or insurance purposes. § 1681b(3)(A–D). The credit reporting agency may also issue a report to a person the agency believes "has a legitimate business need for the information in connection with a business transaction involving the consumer." § 1681b(3)(E). By its terms, section 1681b imposes requirements only on consumer reporting agencies. The FCRA also provides, however, a mechanism for monitoring and limiting the actions of parties who request credit information from credit reporting agencies.

▆ Users of credit reports who violate specific provisions of the Act are subject to criminal and civil penalties. *See* §§ 1681n-q. Sections 1681n and 1681o create civil liability for willful (§ 1681n) or negligent (§ *1681o*) noncompliance by a consumer reporting agency *or user of information* who fails to comply with "any requirement under this subchapter with respect to any consumer ...." Thus, users who fail to comply with any "requirement" imposed by the FCRA on users of credit information can be held liable by consumers. In addition, section 1681q imposes criminal liability on "[a]ny person who knowingly and willfully obtains information on a consumer from a consumer reporting agency under false pretenses."

▆ In *Hansen v. Morgan*, 582 F.2d 1214, 1219 (9th Cir.1978), the Ninth Circuit held that section 1681q, the *criminal* provision, imposed a "requirement" on users of information not to obtain consumer credit information under false pretenses. Because users could be held *civilly liable* under sections 1681n and 1681o for failing to comply with any "requirement" under the Act, the Ninth Circuit concluded that a violation of § 1681q formed a basis for civil liability under either 1681n or 1681o. The court explained:

The principle mechanism for accomplishing [the FCRA's goals] is the regulation of reporting of consumer information by consumer reporting agencies. But requirements were also placed on users of credit information. This was necessary because the objectives of the act could be defeated is users could obtain information from consumer reporting agencies under false pretenses with impunity. Even consumer reporting agencies acting in good faith cannot prohibit illicit use of consumer information if users are not bound to obtain consumer reports only for permissible purposes.

*Id.* Thus, a user who obtains a consumer report under false pretenses may be held civilly liable by the consumer.

▆ The standard for determining whether a consumer report has been obtained under false pretenses will usually be defined in relation to the permissible purposes of consumer reports which are enumerated in § 1681b. "This is because a consumer reporting agency can legally issue a report only for the purposes listed in 1681b. If the agency is complying with the statute, then a user cannot utilize an account with a consumer reporting agency to obtain consumer information for a purpose not permitted by § 1681b without using a false pretense." *Id.* Stated differently, because § 1681b provides the only permissible purposes for issuing a credit report, and the credit reporting agency cannot issue a report for any other purpose, the only way a user can obtain a credit report for impermissible purposes is to misrepresent the purpose for obtaining the report. When the user uses false pretenses for obtaining the report, he is subject to civil liability under § 1681q.

Plaintiff claims that the defendants are liable under § 1681q because they obtained his credit report for an impermissible purpose and under false pretenses. Defendants respond that they cannot be held liable for obtaining a report for an impermissible purpose under § 1681b because they are not consumer credit agencies. While it is true that the defendants cannot be held liable under § 1681b because they are not credit

reporting agencies, they nevertheless face liability under § 1681q if they obtained the credit report for a purpose not enumerated in § 1681b.

### 1. *Did Defendants Obtain the Report for a Permissible Purpose?*

Section 1681b spells out the purposes for which a credit report may be furnished. That section provides that the consumer reporting agency may furnish a credit report to a person which it has reason to believe:

(A) intends to use the information in connection with a credit transaction involving the consumer on whom the information is to be furnished and involving the extension of credit to ... the consumer; or

(B) intends to use the information for employment purposes; or

(C) intends to use the information in connection with the underwriting of insurance involving the consumer; or

(D) intends to use the information in connection with a determination of the consumer's eligibility for a license or other benefit granted by a governmental instrumentality ...; or

(E) otherwise has a legitimate business need for the information in connection with a business transaction involving the consumer.

15 U.S.C. § 1681b.[3] The FCRA defines "credit" as the "right granted by a creditor to a debtor to defer payment of a debt or to incur debt and defer its payment." 15 U.S.C. § 1602(e). A creditor refers only to a person who both (1) regularly extends, whether in connection with loans, sales of property or services, or otherwise, consumer credit which is payable by agreement in more than four installments or for which the payment of a finance charge is or may be required, and (2) is the person to whom the debt arising from the consumer credit transaction is initially payable on the face of the evidence of indebtedness or, if there is no such evidence of indebtedness, by agreement. 15 U.S.C. § 1602(f).

Defendants maintain that their purpose in obtaining the credit report fell squarely within the catchall reference to furnishing reports to persons who "otherwise ha[ve] a legitimate business need for the information in connection with a business transaction involving the consumer." § 1681b(3)(E). The plaintiff argues that the Ninth Circuit has interpreted the catch-all provision in subsection (E) narrowly, and under the Ninth Circuit's interpretation, defendants did not have a "legitimate business need" for the report.

Courts have interpreted the "legitimate business need" provision in different ways. In *Mone v. Dranow*, 945 F.2d 306 (9th Cir. 1991), the plaintiff sued his former employer, claiming that the former employer obtained his credit report for an impermissible purpose. The defendant obtained the report after initiating suit against the plaintiff for unfair competition. Dranow argued that his request for a credit report fell within the "business need" exception of § 1681b(3)(E) because he sought to determine whether Mone had sufficient assets to pay a judgment in the unfair competition case or in a separate action for $39,000 contemplated by Dranow. The Ninth Circuit rejected this argument, concluding that Dranow did not have a "legitimate business need" for the report, within the meaning of subsection (E). The court first examined the legislative history of the Act.

Congress intended the FCRA to authorize a credit reporting agency to issue a consumer report to determine "an individual's eligibility for credit, insurance or employment." 116 Cong. Rec. 36,572 (1970) (Statement of Rep. Sullivan). Reports used for "business, commercial, or professional purposes" are not within the purview of the statute. *Id.* Determining whether an adverse party in litigation will be able to satisfy a judgment is plainly a purpose unrelated to an individual's eligibility for credit, insurance or employment. A contrary construction of the statute would frustrate Congress' intent.

---

3. Section 1681b was amended in 1996, and now lists six permissible purposes, (A)—(F). That amendment did not become effective, however, until September 30, 1997. The transaction at issue here occurred in October 1996, before the effective date of the amendment.

*Id.* at 308. The court then stated that this narrow view of 1681b(3)(E) was consistent with other court decisions, including *Houghton v. New Jersey Mfrs. Ins. Co.*, 795 F.2d 1144, 1149 (3d Cir.1986), in which the Third Circuit concluded that to fall within the business need exception of section 1681b(3)(E), a transaction "must relate to one of the other specifically enumerated transactions in §§ 1681a(d) and b(3), i.e., credit, insurance eligibility, employment, or licensing." The Third Circuit explained that a broad interpretation of the business transaction language of § 1681b(3)(E) would render the specificity of §§ 1681a(d) [ defining "consumer report"] and b(3) meaningless. Although the Ninth Circuit did not state specifically that it was adopting the Third Circuit's analysis, it cited it as further support for its view that business, commercial, or professional purposes are not within the purview of the statute. *See also Ippolito v. WNS, Inc.*, 864 F.2d 440, 451 (7th Cir.1988) (the definition of "consumer report" in 1681a(d) is limited to information used in connection with a business transaction involving one of the consumer purposes set out in the statute, that is, eligibility for personal credit or insurance, employment purposes, and licensing).[4]

In *Estiverne v. Sak's Fifth Avenue*, 9 F.3d 1171 (5th Cir.1993), the Fifth Circuit, without referring to *Mone, Houghton,* or any of the other cases supporting the narrow view, held that obtaining credit information for the purpose of deciding whether to accept or reject a check in payment was a "legitimate business need" under 1681b(3)(E). In reaching its conclusion, the court looked to the FTC's own commentary regarding what constitutes a "consumer report" under the FCRA. The FTC stated in its commentary that a report indicating that a person has issued bad checks was a consumer report, and "[t]he information furnished bears on consumers' character, general reputation and personal characteristics, and it is used or expected to be used in connection with business transactions involving consumers." *Estiverne*, 9 F.3d at 1173 (quoting 16 C.F.R. § 600 app.). The court also noted that elsewhere in the commentary the FTC explained that under 1681b(3)(E) "a party has a permissible purpose to obtain a consumer report on a consumer for use in connection with some action the consumer takes from which he or she might expect to receive a benefit." *Id.* (quoting 16 C.F.R. § 600 App.).

In *Trans Union Corp. v. F.T.C.*, 81 F.3d 228 (D.C.Cir.1996), the D.C. Circuit attempted to harmonize the various interpretations of subsection (E). In that case, a consumer reporting agency petitioned for review of a Federal Trade Commission order holding that the agency's sale of certain mailing lists was communication of "consumer reports" for a purpose that was impermissible under the FCRA. Trans Union, the credit reporting agency, argued on appeal that selling the lists to mass marketers was a legitimate business need under subsection (E). The court noted:

> At the outset this involves a standard difficulty with any catchall phrase—that it should not be read so broadly as to render all the specific terms superfluous or so narrowly as to become superfluous itself. Further, § 1681a(d)'s definition of "consumer report" cross references to § 1681b, so that if § 1681b(3)(E) is read broadly all manner of things may be swept up in the

**4.** This narrow view of the "business need" provision has not been universally accepted or adopted. In the *Houghton* opinion, Judge Sloviter questioned in a concurring opinion the majority's "extremely limited construction" of subsection (E), i.e., that the business transaction must relate to one of the other specifically enumerated transactions in § b(3): credit, insurance eligibility, employment or licensing. Judge Sloviter stated while it was reasonable given the context of the statute to read subsection (E) narrowly as it is incorporated into the definition of a "consumer report" in 1381a(d), such a construction for purposes of section 1381b itself would render subsection (E) superfluous.

The construction the majority applies is inconsistent with the established canon it refers to that "a statute should be interpreted so as to give effect to every phrase and not render any part superfluous." 795 F.2d at 1150. The majority's construction render subsection (E) superfluous. If (E) is limited to the four preceding subsections (A) through (D), it would not have introduced subsection (E) with the words *"otherwise* has a legitimate business need . . ."
*Id.* at 1151–52.

definition of consumer reports, but is it is read narrowly the Act may constrain "legitimate business" transactions far more than Congress is likely to have contemplated.

*Trans Union,* 81 F.3d at 233–34. The *Trans Union* court then cited with approval the FTC's view that implicit in § 1681b(3)(E) is a requirement that the "consumer have sought to initiate the transaction." *Id.* at 234. The court found this requirement consistent with the purposes of the statute, which include respect for the consumer's right to privacy.

> It seems consistent with this view that information about a consumer, once it has been found to have the sensitive character required to qualify as a consumer report covered by the Act, be kept private except under circumstances in which the consumer could be expected to wish otherwise *or, by entering into some relationship with a business, could be said to implicitly waive the Act's privacy to help further that relationship.*

*Id.* (emphasis added). To that end, the court held that "the 'legitimate business' catchall of § 1681b(3)(E) is best understood as meaning types of business transactions *similar to* those set forth in subsections (A) through (D), i.e., those for which information gathered for credit (and the other specific purposes) is central." *Id.* (emphasis added).

With respect to the specific facts of that case, the *Trans Union* court held that there was no resemblance between target marketing and those other purposes: extension of credit, employment, underwriting of insurance, and license eligibility. Thus, the court found that target marketing was not a legitimate business purpose under the Act.

■ *Trans Union* provides a reasonable interpretation of subsection (E), which is not inconsistent with the Ninth Circuit's decision in *Mone.* In *Mone,* the Ninth Circuit held that obtaining a credit report for the purpose of determining whether an adverse party in litigation would be able to satisfy a judgment was not a legitimate business purpose under the FCRA. In reaching its decision, the *Mone* court relied upon a statement in the legislative history that credit reports should be issued to determine "an individual's eligi-

bility for credit, insurance, or employment," and not for "business, commercial, or professional purposes." Because the purpose for which the defendant obtained the plaintiff's credit report was unrelated to credit, insurance, or employment, the purpose was outside the scope of the legitimate business need exception in subsection (E). *Mone* did not hold, however, that the only proper purposes for obtaining a credit report are those specifically identified in subsections (A) through (D). Such an interpretation of the legitimate business need exception would render subsection (E) superfluous, and there is nothing in *Mone* to suggest that subsection (E) is a nullity. *Mone* merely recognized that in interpreting the catchall provision, courts must be mindful of the types of consumer transactions the FCRA was intended to cover. Thus, to fall within subsection (E), a business transaction involving a consumer must be similar to or associated with the transactions identified in (A) through (D). This interpretation is consistent with the language of the statute itself, which states that subsection (E) allows credit reports to be provided to persons who "*otherwise* ha[ve] a legitimate business need for the information." 15 U.S.C. § 1681b (emphasis added). The inclusion of the term "otherwise" suggests that the purposes in subsection (E) are related, but not identical, to those in (A) through (D).

■ The Court concludes that the purpose for which the defendants used the plaintiff's credit report fell within the business need exception of subsection (E). The defendants obtained the credit report to determine whether to grant the plaintiff's application to become an AT & T Wireless subscriber, which in turn depended upon his ability to pay for the cellular service he would use as a subscriber. AT & T follows this procedure because subscribers, particularly new subscribers who are unfamiliar with cellular service, may incur very large bills within the span of one month. *See* Takeuchi Decl., docket no. 23, at ¶ 5. Even if this transaction fails to meet the specific definition of "credit" as used in subsection (A), it nevertheless has many of the attributes of a traditional credit arrangement and thus was *similar to* or akin to such a credit transaction. The defendants,

having had a legitimate business need for the plaintiff's credit information, obtained the credit report for a permissible purpose under § 1681b. This result is not inconsistent with *Mone*, where the credit report was obtained for a purpose that bore absolutely no relation to credit. Mone was not a consumer; instead, he was Dranow's adversary in litigation.

The FTC's Interpretation of subsection (E), while not binding on the Court, is also instructive on this point. The FTC describes the "legitimate business need" exception as follows:

> Under this subsection, a party has a permissible purpose to obtain a consumer report on a consumer for use in connection with some action the consumer takes from which he or she might expect to receive a benefit that is not more specifically covered by subsections (A), (B), or (C). For example, a consumer report may be obtained on a consumer who applies to rent an apartment, offers to pay for goods with a check, applies for a checking account or similar service, seeks to be included in a computer dating service, or who has sought and received overpayments of government benefits that he has refused to return.

16 C.F.R. Pt. 600, App. at 511. The first two examples noted in the Commission's commentary involve business transactions initiated by the consumer where the party transacting with the consumer has an interest in determining the consumer's ability to pay. The transaction here fits that mold.

A false pretenses claim under § 1681q turns on whether the user obtained the credit information for a permissible purpose. Having concluded that the defendants had a legitimate business need for the plaintiff's credit report, the Court finds there is no basis for plaintiff's false pretenses claim under § 1681q. Accordingly, the Court GRANTS the defendants' motion for summary judgment on its claim under § 1681q. Plaintiff has abandoned several other federal claims, *see* Plaintiff's Response at 1–2, and summary judgment is hereby GRANTED on those claims as well. Because the Court's analysis of plaintiff's federal claims applies to plaintiff's state law claims as well, those claims are also dismissed with prejudice. Plaintiff's motion for class certification is stricken as moot.