**HORLICK et al. v. WRIGHT et al.**

**No. 1474.**

Municipal Court of Appeals for the District of Columbia.

Argued April 5, 1954.

Decided May 13, 1954.

J. Ambrose Kiley, Washington, D. C., for appellants.

Harry L. Ryan, Jr., Washington, D. C., for appellee W. B. Wright.

John Cabot White, Washington, D. C., for appellee Carter Const. Corp.

W. Byron Sorrell, Washington, D. C., entered an appearance for appellee Carter Const. Corp.

Before CAYTON, Chief Judge, and HOOD and QUINN, Associate Judges.

3. Cf. Zoslow v. National Savings & Trust Co., 91 U.S.App.D.C. 391, 201 F.2d 208.

CAYTON, Chief Judge.

This action was brought by Wright, a real estate broker, to settle conflicting claims to a $1,000 deposit held by him under a contract for the sale of real estate. He named as defendants the purchasers, Mr. and Mrs. Horlick, who had demanded return of the deposit, and the seller, Carter Construction Corporation (hereinafter called Carter) who had demanded that the deposit be forfeited. Wright took a neutral position in the controversy, asserting that he stood ready to dispose of the deposit as the court might order. Thus the contest was between Carter and the Horlicks. The trial court found for Carter, and the Horlicks have appealed.

The dispute centers around paragraphs 18 and 21 of the contract, which read as follows:

"(18) It is understood and agreed that this home is to be bought and financed under the G. I. Bill of Rights and is subject to approval by Veterans Administration of purchase price not to exceed Twenty One Thousand Nine Hundred Fifty ($21,950.00); said Eighteen Thousand Dollar First Deed of Trust herein mentioned has already been committed by the first Federal Savings & Loan Assoc. of Washington, D. C., and said loan must be placed with this company, otherwise Secondary financing will be arranged.

"(21) The purchaser agrees to accept the following financing in the event the house is not financed under the aforementioned G I financing * * *."

The testimony showed that the Horlicks discussed financing with Carter before signing the contract. It is clear that they hoped to secure a loan on the property to be guaranteed by the Veterans' Administration pursuant to the Servicemen's Readjustment Act of 1944.[1] But it also appeared that Carter was opposed to dealing with the Veterans' Administration and that he preferred other financing arrangements.

The parties attempted to resolve this basic difference by including the above two paragraphs in the contract, calling for alternative means of financing.

The contract was signed by the Horlicks on December 19, 1952, and by Carter on December 22. Settlement was originally set for February 3, 1953, but was extended to February 21, at the request of the Horlicks. On February 5, the Veterans' Administration issued a "Certificate of Reasonable Value" appraising the property at $17,500, which was $4,450 less than the contract price. Since the Servicemen's Readjustment Act provides that loans may not be guaranteed unless the purchase price does not exceed the "reasonable value" of the property, this appraisal prevented obtaining a government-guaranteed loan. Thereafter, on February 11, Carter wrote to the Horlicks informing them that since the Veterans' Administration had disapproved the loan, they should proceed "in making settlement under the terms of alternate financing * * *." In response the Horlicks requested that Carter cooperate with them by furnishing a schedule of his construction costs, as a basis of appealing to the Veterans' Administration for a higher appraisal. At first Carter indicated willingness to so cooperate, but on February 13, he refused to do so, and thereupon the Horlicks notified him by letter dated February 18 that they considered the contract "nullified." After the settlement date, Carter declared the deposit forfeited.

▮▮ On this appeal the Horlicks argue that Carter's failure to furnish his construction costs prevented them from obtaining the financing set forth in paragraph 18, and that this action constituted a breach of contract. Carter contends that he was not obliged to furnish such costs, and that upon receipt of the low appraisal from the Veterans' Administration the Horlicks were bound to proceed with the purchase according to the terms of paragraph 21.

Both arguments hinge upon the meaning given paragraphs 18 and 21. While these sections are somewhat inartfully drawn, it

1. § 501, 58 Stat. 292, as amended, 38 U.S.C.A. § 694a.

is clear that the parties intended that efforts should first be made to secure Veterans' Administration approved financing, and if that failed, then paragraph 21 was to be followed. The question is whether, within the meaning of the contract, the purchasers were obliged to abandon veterans' financing upon receipt of the $17,500 appraisal, and proceed with the purchase according to the alternative plan of financing.

We think that under the circumstances here presented they were not. It is clear from paragraph 21 that the Horlicks were not bound to finance the deal in that alternative manner except "in the event the house is not financed under the aforementioned GI financing." The contract did not specify the point at which "GI financing" shall be deemed to have failed. Therefore, it must be presumed that the parties intended that the purchasers should be permitted to make reasonable and necessary efforts to secure Veterans' Administration approval, and not until after failure of such efforts should paragraph 21 become applicable. Also, we think that the clause bound Carter to extend reasonable cooperation in furnishing information which would help secure a favorable appraisal of the property; otherwise the first clause would have little or no meaning. If the parties had intended that veterans' financing should be sought to a limited extent only, then paragraph 21 should have been drawn so as to take effect upon some specific event. It was not contended that the first appraisal was necessarily conclusive. Indeed there seems to be no question that application for an increased appraisal could have been made; and we cannot hold that the Horlicks' desire to take that action was unreasonable. On the other hand, by refusing to furnish information at his disposal, Carter placed himself in a position of withholding cooperation in a step vital to the contract.

Carter argues that there is nothing to show that an application for increase in the appraisal would have been successful. But whether the application would have been successful or not, it was a reasonable step toward securing the primary financing method agreed on, and was therefore within the contemplation of the contract. Hence, until it was taken the purchasers could not be charged with a duty to proceed under paragraph 21. Moreover, it should be noted that an official appraisal is required by the Servicemen's Readjustment Act because the "Government would not assist in a transaction where the veteran was not getting his money's worth."[2] Here Carter told the Horlicks that the house had cost more than $20,000 to build. If he had supported that representation by a schedule of construction costs, it would undoubtedly have been of great weight in convincing the Administration that the Horlicks were getting their "money's worth."

Carter also contends that he made it clear before entering into the contract that he would have nothing to do with the Veterans' Administration. But whatever his intentions may have been *prior* to the contract, there can be no doubt that he thereafter accepted the provision calling for veterans' financing. Having done so, he bound himself at the least not to interfere with the obtaining of such financing. It was his own act of refusing to supply his construction costs which prevented the purchasers from proceeding to perform under paragraph 18, and having prevented performance by the Horlicks, he cannot now be permitted to claim that they had defaulted. "It is a principle of fundamental justice that if a promisor is himself the cause of the failure of performance * * he cannot take advantage of the failure."[3]

Reversed.

QUINN, Associate Judge (dissenting).

I fail to find one word or suggestion in the contract that bound Carter to extend reasonable cooperation in furnishing infor-

2. Karrell v. United States, 9 Cir., 181 F.2d 981, 984, certiorari denied, 340 U.S. 891, 71 S.Ct. 206, 95 L.Ed. 646.

3. 3 Williston, Contracts § 677 (Revised edition), and cases cited therein. See also Restatement, Contracts §§ 295, 315; Karrick v. Rosslyn Steel & Cement Co., 58 App.D.C. 89, 25 F.2d 216.

mation to the Horlicks, which would assist them in securing a favorable re-appraisal of the property in question. The testimony reflects that the Horlicks through their agent, Mrs. Peck, contacted Carter and presented him a contract signed by the Horlicks which provided: "It is understood and agreed that this home is to be bought and financed under the G. I. Bill of Rights and is subject to approval by Veterans Administration of purchase price not to exceed Twenty One Thousand Nine Hundred Fifty ($21,950.00); said Eighteen Thousand Dollar First Deed of Trust herein mentioned has already been committed by the First Federal Savings & Loan Assoc. of Washington, D. C., and said loan must be placed with this company, otherwise this agreement of sale shall become null and void."

Carter refused to sell to the Horlicks with this provision in the contract. He advised them that he was not interested in obtaining Veterans' financing because it would tie up the house for a considerable period of time and therefore he would have nothing to do with "V. A." financing. It was then that Mrs. Peck, agent for the Horlicks, inserted Paragraph 21 (quoted in the majority opinion) into the contract to which provision Carter agreed. Carter testified that it was agreed that the Horlicks would have the burden of obtaining Veterans' financing, while he, Carter, would be charged with the responsibility of obtaining other financing if it became necessary.

The nub of this entire case is simply this: Did Carter, under the contract, obligate himself to furnish his construction costs to the Horlicks so that they might file an appeal with the Veterans Administration in order to obtain a higher appraisal on this house? I do not believe so. Surely his refusal to furnish the costs was not a breach of the contract because the contract placed no obligation on Carter to furnish this information. I agree with my colleagues that the contract was "inartfully drawn," but it was drawn by the agent of the Horlicks, not by Carter. While Carter under the contract might be obligated to give some cooperation, I know of no authority which would require him to make

known his "trade secrets", so that his failure to do so would cause him to be charged with interfering with the Horlicks in obtaining their Veterans' financing. Moreover, there is nothing in the record to show that it is the prevailing custom among builders to submit their construction costs to a prospective purchaser in order for that purchaser to obtain a higher appraisal.

I would affirm the judgment of the trial court in this case.