Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued October 15, 2004      Decided November 30, 2004

No. 04-7010

MICK'S AT PENNSYLVANIA AVENUE, INC. AND
MORTON'S RESTAURANT GROUP, INC.,
APPELLEES

v.

BOD, INC. AND
BARBARA O'DONNELL,
APPELLEES

PAT O'DONNELL
Appellant

———

Appeal from the United States District Court
for the District of Columbia
(No. 99cv03073)

———

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

*Daniel M. Press* argued the cause for the appellant Pat O'Donnell.

*Andrew J. Kline* argued the cause for appellees Mick's at Pennsylvania Avenue, Inc. and Morton's Restaurant Group, Inc.

Before: GINSBURG, *Chief Judge*, and HENDERSON and ROBERTS, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: Pat O'Donnell (O'Donnell) appeals the district court's summary judgment in favor of appellees Mick's at Pennsylvania Ave., Inc. (Mick's) and Morton's Restaurant Group, Inc. (Morton's). Mick's was the lessee of a restaurant property under a 15–year lease of which Morton's was a limited guarantor. Mick's subleased the property to BOD, Inc. (BOD) under a sublease signed by Pat O'Donnell and his then-wife Barbara O'Donnell on behalf of BOD. In addition, the O'Donnells both signed a guaranty agreement assuring BOD's performance under the sublease. The district court concluded that the O'Donnells are liable under the guaranty for rents and sales taxes BOD owes Mick's under the sublease. Having reviewed the district court's judgment de novo, we affirm because, as the district court concluded, "there is no genuine issue as to any material fact" and the appellees are "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Mick's at Pennsylvania Ave., Inc. v. BOD, Inc.*, 99cv3073 (D.D.C. 2003) (Summary J. Dec.).

## I.

On December 12, 1997 the O'Donnells, on behalf of sublessee BOD, and Thomas J. Baldwin, Executive Vice President and Chief Financial Officer of sublessor Mick's, signed the sublease for restaurant premises located at 2401 Pennsylvania

Ave. N.W., Washington, DC. Under the sublease, which ran from December 15, 1997 to November 1, 2000, BOD was to pay monthly "basic rent" of $14,085.05 and "additional rent" consisting of operating costs, taxes, utility costs, insurance "and all other items of Additional Rent payable by the Sublessor under the Lease." Sublease at 2, § 3B. The sublease also provided for an initial three-month "Rent Concession Period," for which BOD would be exempt from its basic rent payment obligations provided it complied with all other sublease terms. On the same day, both O'Donnells also signed the guaranty, agreeing to guarantee BOD's performance under the sublease and to indemnify Mick's for any losses arising from the sublease and BOD's business operation.

BOD opened a restaurant at the subleased location and operated it from about December 15, 1997 until March 1999, when BOD abandoned the premises and ceased paying rent.

On November 17, 1999 Mick's and Morton's filed this action against BOD and each of the O'Donnells, alleging breach of the sublease by BOD and breach of the guaranty by the O'Donnells.[1] The complaint sought to recover unpaid rent under the sublease (both basic and additional) and sales taxes for the months of February and March 1999, which Mick's had paid subject to reimbursement by BOD.

In a memorandum opinion and order filed December 11, 2003 (Summary J. Dec.) the district court granted summary judgment in favor of Mick's and Morton's, ordering the O'Donnells and BOD to pay $131,710.70,[2] including four months' basic rent ($56,340.20 for January to March 1998, the Rent Concession Period, and for March 1999, the final month

---

[1] The complaint alleged diversity jurisdiction under 28 U.S.C. § 1332.

[2] The appellees claim total damages of $121,710.70, Appellees' Br. 5, rather than the $131,710.70 figure calculated and ordered by the district court, Summary J. Dec. at 1 & n.1. The district court made an arithmetic error and should amend its order to reflect the proper amount of $121,710.70.

of occupancy), additional rent in the form of operating costs ($53,160.72 for August 1998 to March 1999) and of trash removal and parking costs ($1,422.11 for March 1999) and sales tax reimbursements ($10,787.67 for February to March 1999). Pat O'Donnell timely appealed the district court's judgment.[3]

## II.

We address each of Pat O'Donnell's arguments separately.

### A. Sales Taxes

First, O'Donnell disputes the award of $10,787.67 reflecting sales taxes which Mick's paid subject to reimbursement by BOD for the months of February and March 1999. O'Donnell asserts that, because BOD's obligation to repay the funds arose under a side oral agreement separate from the sublease, he is not required to cover the tax advances under the guaranty. We disagree.

The sublease expressly requires that BOD pay as part of its additional rent under the sublease "one hundred (100%) percent [sic] of all items of 'Additional Rent', as defined under Lease, which are payable by Sublessor under the Lease, including without limitation, 'Operating Costs', 'Taxes', as defined in the Lease, utility charges, insurance and all other items of Additional Rent payable by Sublessor under the Lease." Sublease at 2, § 3B. The lease, in turn, requires that the tenant

> as Additional Rent, pay all business taxes, rates, duties, levies, assessments and/or license fees imposed in respect of any and every business conducted in, on or from the Leased Premises or in respect of the use or occupancy thereof, to the authorities having jurisdiction thereof promptly when the same shall become due and payable, and before the imposition of any fine or penalties.

_____

[3] Neither BOD, which defaulted in the district court, nor Barbara O'Donnell filed a notice of appeal.

Lease at 25-26, § 11.02. We agree with the district court and the appellees that sales taxes plainly come within the broad category of "all business taxes, rates, duties, levies, assessments and/or license fees imposed in respect of every business conducted" by BOD at the leased premises.[4] BOD was therefore required to pay them as additional rent under the sublease. We further agree that the broad language of the guaranty obliged O'Donnell to reimburse the sales taxes Mick's paid on BOD's behalf. In the guaranty the O'Donnells undertook both generally to "promptly cure any default in any term covenant, or condition of the Sublease" (including default of BOD's obligation to pay sales taxes) and, specifically, to "indemnify and hold harmless Mick's … from and against any and all claims and liabilities, causes of action, and damages, including but not limited to, *tax liabilities*." Guaranty at 2, §§ 2, 3 (emphasis added).

### B. Concession Period Rent

Next, O'Donnell challenges the award of rent for the initial three-month period, January to March 1998. The sublease provides:

> [P]rovided that Sublessee performs all other terms, covenants and conditions of this Sublease, then for the period commencing on the Commencement Date up through March 31, 1998 ("Rent Concession Period"), Sublessee shall not be obligated to pay Basic Rent to Sublessor hereunder.

Sublease at 2, § 3A. The district court concluded that under this proviso the rent conceded during the initial three months (January to March 1998) later became due when BOD ceased

---

[4] O'Donnell argues that the sales tax is not a tax or fee upon the business vendor but upon the purchaser because, as this court has stated, "[t]he legal incidence of the District of Columbia sales tax is on the purchaser," *United States v. District of Columbia*, 669 F.2d 738, 744 (D.C. Cir. 1981). Reply Br. 3-4. In the cited opinion the court also expressly states that "the sales tax is *imposed on the vendor*," 669 F.2d at 744 n.9 (emphasis added; citing D.C. Code § 47-2602), in this case on restaurateur BOD.

operating its restaurant in March 1999 in breach of section 14 of the sublease which required that BOD "continuously operate its restaurant business in a first-class manner" during the sublease term which did not expire until November 2000. We agree with the district court's interpretation of the unambiguous language of the quoted provision. O'Donnell does not dispute that BOD violated section 14 by abandoning the restaurant prematurely but contends this breach did not trigger liability for the conceded rent because the quoted proviso required only that the sublessee not breach other terms of the sublease *during the Rent Concession Period* and did not authorize retroactive rent obligations based on breaches after the period ends. We disagree. The proviso contained no limitation on which sublease terms must be performed or when in order to preserve the rent concession but broadly required performance of "*all* other terms, covenants and conditions" of the sublease, which language unambiguously includes the continuous operation requirement in section 14 (emphasis added).[5]

### C. *Equal Credit Opportunity Act*

Third, O'Donnell resurrects the affirmative defenses, asserted summarily in his answer, of waiver/estoppel, unclean hands and *in pari delicto*, each one premised on his theory that the appellees violated the Equal Credit Opportunity Act, 15 U.S.C. §§ 1691 *et seq.* (Act). We conclude that, under the undisputed facts, Mick's did not violate the Act and that O'Donnell's defenses therefore fail.

The Equal Credit Opportunity Act provides in relevant part:

---

[5] O'Donnell argues for the first time in his reply brief that the Rent Concession Period proviso, as construed by the appellees and the district court, produces an unenforceable retroactive forfeiture. Reply Br. 5 (citing *Red Sage Ltd. P'ship v. Despa Deutsche Sparkassen Immobilien-Anlage-Gasellschaft MBH,* 254 F.3d 1120, 1129 (D.C. Cir. 2001)). Having failed to raise it earlier, O'Donnell has waived this argument. *See Amgen, Inc. v. Smith*, 357 F.3d 103, 117 (D.C. Cir. 2004).

It shall be unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction—

(1) on the basis of race, color, religion, national origin, sex or marital status, or age (provided the applicant has the capacity to contract); . . . .

15 U.S.C. § 1691(a). To implement this provision, the Federal Reserve Board has promulgated the following regulation: "[A] creditor shall not require the signature of an applicant's spouse or other person, other than a joint applicant, on any credit instrument if the applicant qualifies under the creditor's standards of creditworthiness for the amount and terms of the credit requested." 12 C.F.R. § 202.7(d)(1). O'Donnell claims the appellees violated the statute and the regulation by requiring O'Donnell to co-sign the sublease and the guaranty for his wife's restaurant although O'Donnell was not himself a principal of BOD. We reject O'Donnell's Equal Credit Opportunity Act claim for two reasons.

First, under the Act the sublease is not a "credit instrument" subject to 12 C.F.R. § 202.7(d)(1). The Act defines "credit" as "the right granted by a creditor to a debtor to defer payment of debt or to incur debts and defer its payment [sic] or to purchase property or services and defer payment therefor." 15 U.S.C. § 1691a(d) (emphasis added). Mick's did not grant any credit right to BOD under the sublease but acted simply as a sublessor of the restaurant property entitled to receive monthly rent payments for the term of the sublease.[6] Further, neither Mick's nor Morton's falls within

---

[6] In contrast, *Brothers v. First Leasing*, 724 F.2d 789 (9th Cir. 1984), cited by O'Donnell, involved a consumer automobile lease which the Ninth Circuit concluded fit within the Act's definition of "credit transaction" because it required the consumer lessee to pay a fixed sum in equal installment payments at fixed intervals. *See* 724 F.2d at 793 n.8. The court there based its holding on the premise that the anti-discrimination provisions of the Act apply to all transactions covered by the Consumer Leasing Act, 15 U.S.C. §§ 1667-1667e. *See id.* at 791-94. The reasoning in *Brothers*, therefore, has no application to a commercial real estate lease.

the Act's definition of "creditor" as "any person who *regularly* extends, renews, or continues credit; any person who *regularly* arranges for the extension, renewal, or continuation of credit; or any assignee of an original creditor who participates in the decision to extend, renew, or continue credit." 15 U.S.C. § 1691a(e) (emphasis added). There is no evidence that either Mick's or Morton's, each of which is in the restaurant business, "regularly" extends or arranges credit, which, as an element of O'Donnell's affirmative defenses, he must demonstrate on summary judgment. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) ("[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.").

Second, the assertion made before the district court and on appeal that O'Donnell was not a principal involved in BOD's operations is at odds with O'Donnell's own representations at the time he signed the sublease and the guaranty. The two documents variously characterize O'Donnell as one of BOD's "principals," Sublease at 5, § 7A, the "Sublessee," *id.* at 9 (under O'Donnell's signature), BOD's "President" or "Vice President," *id.* at 10 (in "Acknowledgements" by notaries public), one of BOD's two "sole shareholders, directors and officers" and one "hav[ing] a material business interest in the Sublessor [sic]," Guaranty at 1. Having represented himself to Mick's and Morton's when he signed the sublease and the guaranty as an officer and shareholder of BOD in order to secure the sublease for BOD, O'Donnell is equitably estopped from claiming otherwise now to avoid liability under the guaranty. *See First Am. Disc. Corp. v. Commodity Futures Trading Comm'n*, 222 F.3d 1008, 1016 (D.C. Cir. 2000) ("Under the doctrine of equitable estoppel, 'a party with full knowledge of the facts, which accepts the benefits of a transaction, contract, statute, regulation, or order may not subsequently take an inconsistent position to avoid the corresponding obligations or effects.'" (quoting *Kaneb Servs. v. FSLIC,* 650 F.2d 78, 81 (5th Cir. 1981))).

### D. Prior Breach of Lease

Finally, O'Donnell claims any breach of his obligations under the sublease or the guaranty is excused because Mick's itself first breached its implied obligation under the sublease to cooperate with BOD in transferring the restaurant's liquor license into BOD's name. O'Donnell contends that, by failing to pay taxes owed to the District of Columbia for a period preceding the sublease term, Mick's impeded BOD's ability to effect the transfer in breach of this implied obligation. We reject O'Donnell's prior breach theory which, as the district court observed, rests on "an attenuated chain of events." Summary J. Dec. at 5.

It is true that the sublease required BOD to transfer the liquor license to its own name by May 31, 1998, after which time, if it had not, Mick's had "the option, in its sole and absolute discretion, to cancel th[e] Sublease by sending written notice to Sublessee no later than June 7, 1998 in which event th[e] Sublease shall be cancelled." Sublease at 4, § 5B. If no timely notice was sent, BOD was to continue its efforts to change the license name while retaining "the right to continue to operate under Sublessor's Alcoholic Beverage License," subject to Mick's' continuing option to cancel upon 30 days' notice. *Id.* We find no breach, however, of any obligation on the part of Mick's to assist in securing the license change. As BOD acknowledges, the sublease imposes no such express obligation on Mick's. Further Mick's took no affirmative step to prevent BOD from obtaining the license in its own name in breach of an implied obligation.[7] *See R. A.*

---

[7] Nor did Mick's make any attempt to take advantage of the contractual consequence of BOD's failure to transfer the license by invoking section 5B to cancel the sublease. O'Donnell nonetheless claims that by failing to pay the taxes, and thereby preventing the license transfer, Mick's harmed BOD in two ways. First, O'Donnell points to the assertion in Barbara O'Donnell's affidavit below that this failure "put BOD's restaurant in serious risk of being shut down by the D.C. Government," Affidavit of Barbara O'Donnell at 2, ¶ 5, but this risk never materialized. Second, O'Donnell claims that "the lack of a liquor license required BOD to pay cash (COD) to alcoholic beverage distributors," Reply Br. 8, but O'Donnell may not

*Weaver & Assocs. v. Haas & Haynie Corp.*, 663 F.2d 168, 177 n.67 (D.C. Cir. 1980) ("The prohibition against *active* interference is an implied contractual term." (emphasis added; citing *Karrick v. Rosslyn Steel & Cement Co.*, 25 F.2d 216, 217-18 (1928); *Minmar Builders Inc. v. Beltway Excavators, Inc.*, 246 A.2d 784, 787 (D.C. App. 1968); *Matthew A. Welch & Sons, Inc. v. Bird*, 193 A.2d 736, 738 (D.C. Mun. App. 1963); *Horlick v. Wright*, 104 A.2d 825, 827 (D.C. Mun. App. 1954))).

\* \* \*

In light of our foregoing analyses, we conclude that additional discovery would not alter the undisputed material facts or the disposition of O'Donnell's claims and that, therefore, the district court did not abuse its discretion in denying O'Donnell's discovery request. *See Paquin v. Fed. Nat'l Mortgage Ass'n,* 119 F.3d 23, 28 (D.C. Cir. 1997). Accordingly, for the reasons set forth above, we affirm the judgment of the district court.

*So ordered.*

---

rely on this allegation first raised in his reply brief. *Amgen, Inc. v. Smith*, 357 F.3d at 117.